## UNITED STATES v. KING COAL CO.

(Circuit Court of Appeals, Ninth Circuit.
May 11, 1925.)

No. 4401.

1. Collision ⬅73—Moving vessel presumed in fault for collision with anchored vessel.

A collision between a moving vessel and one anchored in a proper place and carrying proper anchor lights is presumptively due to the fault of the moving vessel, which has the burden of proof to show absence of negligence.

2. Collision' ⬅71 (2)—Collision between moving and anchored vessel held not shown to be due to inevitable accident.

The blowing out of a fuse, causing the electrical steering gear of a submarine to become inoperative and the vessel to swing with the tide and come into collision with an anchored barge, held not to establish the defense of inevitable accident, where the vessel was suddenly put up against a strong running flood tide, throwing on the steering apparatus a load too great for the fuse to carry.

Appeal from the District Court of the United States for the Southern Division of the Northern District of California; Frank H. Rudkin, Judge.

Suit in admiralty for collision by the King Coal Company, owner of the barge Ruth, against the United States, owner of the submarine R–19. Decree for libelant, and the United States appeals. Affirmed.

Suit brought under the provisions of the act of Congress approved April 16, 1920 (41 Stats. of U. S. pt. 2, p. 1467).

Sterling Carr, U. S. Atty., of San Francisco, Cal., and Frank Maytham, Sp. Asst. Atty. Gen., for the United States.

Ira S. Lillick, of San Francisco, Cal., for appellee.

Before GILBERT, HUNT, and MORROW, Circuit Judges.

MORROW, Circuit Judge. On October 11, 1918, the barge Ruth, owned by libelant, was anchored in San Francisco Bay, off the docks of the Union Iron Works. The barge remained at this anchorage until October 18, 1918, when the submarine R–19, owned by the United States, coming down from Mare Island at about 8:45 p. m., turned into the Union Iron Works to take on supplies for San Pedro. The Ruth had the proper anchorage lights burning and the night was clear. Objects on the bay were normally visible. When the R–19 came within about 800 feet of the barge, at a speed of from 9 to 10 knots an hour, different commands were given by the commanding officer to reach the dock of the Union Iron Works. The navigation of the submarine resulted in its crashing into the barge, causing the damage for which this suit was brought. Libelant was awarded the sum of $19,179.26 for damages, together with costs. An order was entered dismissing the cross-libel, and the United States appeals.

There are two defenses:

First, that the barge was anchored in a forbidden area.

Second, that the accident was unavoidable.

Because of the alleged improper anchorage, a cross-libel was filed by the United States, claiming damages for injury to the submarine.

This suit was brought under the provisions of the act of Congress approved April 16, 1920 (41 Stats. U. S. pt. 2, p. 1467).

The lower court held that the testimony was not definite and not easy of comprehension as to whether the barge was anchored in the forbidden area; but the testimony did show that the barge had been anchored there for about eight days previous to the accident, and no complaint had been made by the harbor authorities.

As to the second defense, the lower court held that the United States did not establish clearly that the accident was unavoidable.

It is alleged in the libel that at the time of the collision between the submarine R–19 and the barge Ruth, the latter was at anchor in San Francisco Bay off the docks of the Union Iron Works, northeast by north about 1,800 feet.

In the cross-libel of the United States it is alleged that at a point about 1,200 feet off the shore from the wharves of the Union Iron Works, the submarine R–19 came upon and collided with the barge Ruth; that the latter was anchored at a point which obstructed the course of vessels landing or attempting to land at said wharves and at a point where anchorage was forbidden by the state harbor commissioners.

In the answer of the United States to the libel, it is alleged that the collision of the submarine R–19 with the barge Ruth occurred at a point approximately 1,500 feet off the docks of the Union Iron Works. It is denied that the barge was at said time about 1,800 feet off of said docks, or any greater distance off said docks than approximately 1,500 feet. It is alleged that when the accident occurred, the submarine R–19 was attempting to make a landing at the Union Iron Works, and in doing so, proceeded to pass above the barge Ruth, and the current

helped to sweep the submarine down against said barge.

The docks of the Union Iron Works are located at the southern extremity of the San Francisco water front. Between the docks of the Union Iron Works and the free and open space of waters of the bay is a strip of water, 1,500 feet wide, designated by the board of state harbor commissioners as forbidden anchorage. This strip of water extends along the water front of the harbor from Point Avisadero in a northwesterly direction to Pier No. 46. There is another strip of water 1,500 feet wide extending from the Western Pacific ferry slip, south of the Union Iron Works docks, across the Bay of San Francisco, in a northeasterly direction, to the Southern Pacific Railroad Company and the Western Pacific Railway Company training walls on the Oakland water front. This strip is also designated as forbidden anchorage.

These designations by the harbor commissioners of forbidden anchorages in the harbor were authorized by section 2524 of the Political Code of the State, since superseded and jurisdiction assumed by the United States by the Act of Congress of January 28, 1915, creating the Coast Guard, etc. (38 Stat. pt. 1, p. 800; Comp. St. §§ 8459½a[1]–8459½a[6]), and section 7 of the River and Harbor Act of March 4, 1915 (38 Stat. pt. 1, p. 1053 [Comp. St. § 9959a]); but the strips of such forbidden anchorages do not appear to be buoyed or otherwise marked or designated, so that their boundaries on the water are not made visible to the ordinary observer. They appear to be ascertainable mainly by directions from maps and charts with reference to objects on shore, and by the experience of pilots.

The two strips of water designated by the harbor commissioners as forbidden anchorage passing in front of the docks of the Union Iron Works cross each other south of the Union Iron Works, leaving a triangular space of free and open water outside and between the strips of forbidden anchorage waters in front of the docks of the Union Iron Works.

These free and open water spaces in the harbor of San Francisco are now designated as anchorage areas by the Secretary of War, exercising the jurisdiction of the United States in accordance with the rules and regulations issued February 9, 1921. But as the collision here in controversy occurred October 18, 1918, we will refer to the areas as they were then designated.

Whether the barge Ruth was anchored within the free and open water of the harbor, or within the forbidden anchorage, passing immediately in front of the docks of the Union Iron Works, is exceedingly difficult to determine from the testimony; and the maps and charts are of but little assistance in fixing a definite location for the barge.

When the collision occurred, the side of the submarine scraped along the anchor chain of the Ruth and ran out several fathoms. Subsequently, the Ruth was beached, when the anchor chain was slipped and the anchor buoyed, and evidence was introduced tending to show where the anchor was found, but the directions and distances given are not clear. There is, however, testimony tending to show that the Ruth was anchored in the free and open water of the harbor, or, as we would say now, she was anchored within an authorized anchorage area.

The court below was unable to determine from the evidence and the maps and charts the location of the barge Ruth at the time of the collision. We, finding the same difficulty, resort to the more satisfactory testimony of Capt. Meyns, in command of the Merchant Towboat Company, who anchored the barge. This he did on October 11, 1918, and testified that he anchored her off the docks about 1,800 feet in open water. This would be in the open water or anchorage area, and beyond the forbidden anchorage in front of the docks of the Union Iron Works. This witness had been a captain of a tugboat in San Francisco Bay for 31 years, and had anchored more than a thousand vessels. He testified that it was a custom in the harbor of San Francisco for the harbor commissioners to notify any one when a vessel was anchored in forbidden anchorage, and compel them either to remove the vessel, or the vessel was removed by the harbor commissioners at the expense of the owner. The evidence shows that the barge remained where Capt. Meyns anchored her, without objection from the harbor commissioners, for a period of 8 days prior to the collision. There is a presumption in favor of the testimony of this witness by reason of his experience and reliability and the failure of the harbor commissioners to object to the anchorage of the Ruth.

We think, in view of all the facts, the court below was right in holding that the anchorage of the barge in a forbidden area was not established by the evidence, and that no negligence can be attributed to her on that account.

As to the second defense, that the collision was unavoidable, Lieut. William F. Call-

away, who was in command of the submarine at the time of the collision, testified:

"When I arrived at a point which I considered the proper one to make the turn into the Union Iron Works, considering the entrance of the harbor and anchored craft around there, I put the rudder right and brought the vessel around 90 degrees, or possibly a little more, and our course at that time was pointing—we had the tide slightly forward of the beam, that is, we were pointing slightly up against the tide—not perpendicular to it; slightly up against the tide, just up a little."

He was asked, after having put the rudder right, what, if anything, was done with regard to switching from the engines to the motors:

"A. I don't recall just the instant of shifting from the engines to the motors. It was about the time of the turn. We stopped the engines and went to the electrical motors, to better be able to maneuver the ship, as the engines will not back.

"Q. Having put your rudder to the right, what, if anything, thereafter did you do with reference to the rudder? A. After we had made our right turn and were headed on the course which I judged would best clear the traffic and carry us into the Union Iron Works, the left rudder was given in order to steady the ship on her course, and then order was given to 'rudder amidships,' which involved, of course, the right rudder.

"Q. What, if anything, happened after the order was given for 'rudder amidships'? A. After the rudder was given amidships, I noticed that the ship was not steady, was easing off to the left; so I gave 'right rudder.'

"Q. What, if anything, happened then? A. The ship then kept easing off to the left. Before this we had seen the barge, which afterwards turned out to be the Ruth, and noticed that we were easing over toward her, was the reason we had given 'right rudder.'

"Q. 'Right rudder' the second time? A. Yes; that is, from amidships. After you give the 'amidships' you ease off to the right; in fact, she was easing toward the left, down towards the Ruth. By that time I saw that we were going to pass her closely, and I increased the speed in order to get across, and then, after I saw that the bow would clear the Ruth, I gave the orders for 'hard left' in order to throw the stern away from her, but just the time we were crossing her, or right at the time, it was reported that the electrical steering gear was inoperative, and then I gave the orders to shift to hand steering.

By that time we had crossed the bow of the Ruth and struck her anchor chain, and our stern struck her a glancing blow on the bow. After passing across her, we had the hand steering put in, and we rounded the stern of the Ruth, and came up on her starboard side, and some time during that time we shifted back to the electrical gear."

This witness testified further:

"It was necessary to use the electrical steering device going in. We had to cross the bow of the Ruth, practically, to make a 90-degree turn, and after we entered into the Union Iron Works' basin we had to make another 90-degree turn in order to get into the slip. * * * The chief electrician reported to me, as his duty required, of the fuse blown in the steering circuit."

On cross-examination this witness said:

"I can't recall the exact speed which I gave, but it was probably around, or I would say, I would judge it was around nine knots, or ten knots, and then after I saw that the ship was easing over to the left towards the Ruth, I increased the speed in order to pass ahead of her more quickly."

The witness was asked:

"Can you state how far you were away from the barge Ruth when you first observed it? A. I can't give the distance that I was from the barge Ruth when I first observed her, but I observed her long before we ever made the 90-degree turn, because we had seen ships anchored before the entrance to the Union Iron Works, and I was observing not only the shore line, but the vessels around the place where I intended to go in.

"Q. Can you state how far you were away from the Ruth before it gave you any concern as to the manner in which you would maneuver your own vessel? A. I was considering the Ruth at the time I made my right turn, because I had seen her before that, and we saw the vessel in front of the entrance to the harbor, and I necessarily considered her when I made my right turn."

The witness was asked:

"How do you account for the submarine colliding with the Ruth, then? A. The submarine collided with the Ruth due to the steering gear becoming inoperative with left rudder on, and allowing the R–19 to gain ground to the left, instead of pursuing the course which I had contemplated pursuing."

Lieut. Leverett S. Lewis, who was the navigator and at the wheel of the submarine at the time of the collision, testified:

"When we got off the Iron Works, we turned with the right rudder to head in to the dock; as a usual thing, in making a

90-degree turn, we use about 25 degrees right rudder.

"After we had completed the turn of approximately 90 degrees, the captain ordered left rudder, to steady her on the new course, which is customary, and I put the controller to the left, putting on the left rudder to steady her; there was about a four-knot tide, flood tide, at this time, and after we completed the turn, a barge was noted on our port bow at anchor.

"Q. That left rudder, you say, was for the purpose of steadying the submarine? A. That left rudder was for the purpose of steadying her on the new course. After a boat starts to turn, it turns very rapidly, and it is necessary to give her the opposite rudder for just a few seconds to steady her. As that happened at this time, the captain said 'left rudder' to steady her on the course, and then 'rudder amidships.'

"Q. How long a time elapsed between the time of the order of 'left rudder' and 'rudder amidships,' approximately? A. Approximately five seconds.

"Q. Now, about how far was the submarine from the barge at the time that order was given, 'rudder amidships'? A. The barge was about broad on our port bow, and in such a position that it seemed we would clear her by 100 feet.

"Q. What was the next maneuver? A. The captain evidently noticed at this time that the boat was starting to swing to the left, because he gave the order 'right rudder,' and immediately after that we noticed that the tide was setting us down on the Ruth, and the bow was not swinging to the right; and the captain then saw that although the bow of the submarine would clear the Ruth, it was possible that the stern would hit, so then he gave 'full left rudder' to throw the stern out, and went ahead on the motors to increase the speed. Our side scraped along the anchor chain of the Ruth and ran out several fathoms of the chain, and then the port side aft of the submarine hit the bow of the Ruth a glancing blow."

This witness was asked:

"Q. What is your explanation as to the reason why this fuse blew out? A. The only explanation I could offer is that the strong tide running at that time, the rudder was put up against the tide, and that the load was too great for the fuse to carry. The only other explanation would be defective fuse, and that very seldom happens, I believe."

Robert S. Pearson was chief electrician on the submarine R–19 at the time of the collision with the barge Ruth. He testified that he was on the bridge at that time, saying:

"At that time we saw that the barge Ruth was in very close proximity to us, and the commanding officer ordered 'hard right rudder,' in order to be sure to clear her. * * * The rudder evidently did not take, and the commanding officer, seeing that a collision might be caused, ordered 'hard left rudder'; at that time the man in the conning tower, who was watching the indicator —there is an indicator in the conning tower that designates by five degrees how the rudder acts—noticed that the steering gear was out of commission. The order was given to rig the hand-steering gear. Before this could be done, we raked the Ruth's anchor chain, and our stern collided with her bow."

. This witness was asked:

"What was the cause of the refusal of the rudder to respond to the will of the operator under the command 'right rudder'? A. Both fuses were blown out."

Witness was asked:

"Have you ever known of a steering gear fuse to have blown out before? A. Not on the R type boats."

[1] These three witnesses were officers of the submarine R–19, called by the United States, and the situation was clearly stated by them, aside from the discrepancy in the testimony of the commanding officer and the navigator as to the time when the Ruth was discovered. The barge Ruth was at anchor with her anchor lights burning. Her anchorage was not in a forbidden area. Her visibility to moving shipping was normal, and her position was discovered in time for safe navigation on the part of the submarine. The presumption is, in such a situation, that the barge at anchor, properly lighted, was not at fault, while, on the other hand, the presumption is that the moving submarine, charged with reasonable caution, was at fault, and the evidence supports this presumption.

[2] The United States contends that the collision was unavoidable, and that the commanding officer had the right to rely upon the electric steering apparatus, and that the blowing out of the fuse was an accident that could not be anticipated.

Counsel for the United States contend that the facts in this case bring it within the interpretation based upon the facts of the case of The Olympia, 61 F. 120, 9 C. C. A. 393. The collision in that case occurred when the tiller rope on the Olympia broke. The court held that the accident was caused by a latent defect in the rope which could not have been discovered by reasonable inspection;

consequently, the collision was held to have been caused by an inevitable accident. But in the course of his opinion, Judge Lurton of the Circuit Court of Appeals for the Sixth Circuit makes a distinction applicable here. He said:

"The defendants say, 'Our tiller rope broke, and the vessel became unmanageable, and the collision unavoidable.' That only shows that the breaking of the tiller rope was the cause of the collision. They must go further, and show that the cause which operated to break the tiller rope was unavoidable. The collision was but the result of the cause which produced a broken tiller rope. If that cause is not shown to be unavoidable, how can it be said that the collision was an inevitable accident? Unless the defendants can get rid of the negligence proved against them by showing the cause which broke this wheel rope, and that the result of that cause was inevitable, or by showing all the possible causes which might have produced such an effect, and then showing that the result of each one of these possible causes could not have been avoided by them, they have not met the burden of proof which rests upon them. * * * Was it due to mismanagement of the steering wheel? The full force of the power of the steering engines suddenly thrown upon the steering gear might produce such a sudden strain as to snap the wheel rope. This full force could only be exerted by very suddenly putting the steering wheel hard over. If there was no necessity for putting the wheel hard over suddenly instead of slowly, and a parting was the result, negligence might well be imputed. But the evidence rebuts the theory that this was the probable cause." Here is the distinction: "The evidence of the wheelman does not show that the wheel was put hard over, or suddenly handled in any way."

Had the commanding officer, under the circumstances disclosed in the testimony, the right to put the electric steering apparatus, controlling the rudder, up against a strong running flood tide, throwing suddenly on the apparatus a load too great for the fuse to carry?

The burden is clearly upon the officers of the submarine to justify such dangerous navigation. The strain on the electrical apparatus should have been anticipated when too great a load was placed upon it. In the situation we have here presented, the doctrine applicable is res ipsa loquitur—the situation speaks for itself—and fixes the charge of negligence upon the submarine.

The decree of the District Court is affirmed.