## THE MARIAN.
### DUNCANSON–HARRELSON CO. v. DAVIDSON et al.

#### No. 6759.

Circuit Court of Appeals, Ninth Circuit.
July 27, 1933.

Resleure & Vivell, of San Francisco, Cal., for appellant and cross-appellee.

George H. Hauerken, of San Francisco, Cal., for appellees and cross-appellants.

Before WILBUR, Circuit Judge, and JAMES and NORCROSS, District Judges.

NORCROSS, District Judge.

This is an appeal of libelant and cross-appeals of respondents presenting questions of negligence of the respective parties resulting in a collision on the Bay of San Francisco, and in the event both were so negligent, the rule applicable in the apportionment of damages.

Libelant, appellant and cross-appellee, on and prior to the 8th day of July, 1930, owned and operated on the Bay of San Francisco a barge used for submarine drilling, known as Drill Barge No. 3, which barge on the date mentioned was anchored in San Pablo Strait between the Marin Islands and a group of large rocks called The Brothers, for the purpose of drilling holes in the bottom of said strait as preliminary work for the building of a bridge from near Point San Pablo to the opposite Marin shore. About 3:55 a. m.

on the date mentioned the tugboat Marian, towing three barges in tandem, approached the drill barge on a southerly course from San Pablo Bay, and in passing or attempting to pass the drill barge the third or last barge of the tow collided first with the aft anchor cables and breast line of the drill barge, and then with the drill barge, breaking said cables and line and damaging her drill cage. The libel was in personam and in rem, and the answer thereto denied negligence or fault upon the part of the tugboat Marian, and alleged that the collision was occasioned by the fault of libelant in not maintaining requisite buoys and not displaying proper lights. The court in a memorandum decision held that the collision was occasioned by negligence upon the part of the operators of both the drill barge and the tugboat, but that the negligence of the latter "was relatively slight," and directed that "libelant will pay four-fifths of the damages, and respondents one-fifth."

Prior to June 27, 1930, libelant's drill barge was anchored in the navigable channel of San Pablo Strait, and the work of drilling was commenced on that date. The drill barge was approximately in midchannel between The Brothers on the easterly side and the 16–17 foot shoal on the westerly or Marin side. The channel between these two points is slightly in excess of a mile in width, and of a depth from 25 to 100 feet. To the outer edge of the 6–7 foot shoal on the Marin side there was an additional 3,000 feet. The drill barge was moored in position, in 90 to 100 feet depth of water, by ¾-inch cables off each corner at approximately a 45-degree angle, and a breast line off the port or easterly side. Each of the cables was attached to a 5,000-pound anchor, lying in about 90 to 100 feet of water. Each cable was about 1,000 feet long, and due to its diagonal position from the barge to the bottom and its normal sag, stood off from the barge about 800 feet. A buoy, consisting of a 50-gallon drum, painted white, was originally attached to each anchor. The anchor cables were submerged about 5 feet at a distance of 40 feet out from the barge, and were submerged about 12 feet at a distance of about 80 feet therefrom.

On the morning of July 7, 1930, it was discovered that the northwest buoy, and also the breast line buoy, were missing. Later it was found that the steel wire rope holding the northwest buoy had been cut and the breast line buoy had been rammed and sunk, apparently by unknown vessels. On the afternoon of July 7, 1930, the workmen on the barge quit at 4 o'clock and the watchman came on board about sunset. At 7:30 p. m. he put

the three red lights on the mast in the vertical position required by Regulation 5 of the United States Supervising Inspectors, and in addition put a white light on each corner.

The respondent's tug Marian left the Port of Crockett on the night of July 7, 1930, with three barges, each loaded with about 400 tons of molasses, and each from 106 to 110 feet in length, towed in tandem on a hundred foot tow line, making the total length of the caravan 450 to 460 feet. The night was clear and remained so, with a strong ebb tide running. The tug was in charge of respondent Captain Davidson, who was assisted in his various duties by Fred Sutter, also a licensed operator. No lookout, separately charged with that duty, was aboard the tug. Captain Davidson testified that he knew the barge was in that location and "had an idea" as to how it was anchored; that he had had occasion to go through that portion of the bay many times, usually about twice a week; that he first observed the drill barge when he was half a mile away from the point of collision. Fred Sutter testified that he also knew the location of the barge, had passed it some six or seven times, and while he was steering, held inside of the beacon on the Marin shore in order to keep away from the drill barge; that he also knew that the drill barge would have cables and anchors out to hold it in place, and estimated the distance that the Marian was from the drill barge when he first saw it, as about three-quarters of a mile.

The draft of the tug was estimated by Captain Davidson to be about 7 feet. The registered depth of the tug when it was built some thirty years before was "4 feet 9." Since that time another engine with more fuel tanks had been installed therein, which may account for some increase over its original draft. The draft of the barges was not in excess of that of the tug. The cables from the drill barge were submerged about 5 feet, 40 feet therefrom, and at a distance of 80 feet, would be submerged approximately 12 feet.

Rule 5 of the Rules of the Supervising Inspectors required that the lights of the drill barge "shall be of such size and character as to be visible on a dark night with a clear atmosphere for a distance of at least two miles." John Walker, foreman on the drilling job and in charge of the barge, testified for libelant that "the lights could be seen plainly easily two miles." The conclusion of the court expressed at the conclusion of the trial respecting these lights was: "The three lights were exhibited and could have been seen for a distance of at least more than a

mile." The findings submitted by respondents and adopted contain the statement: "That said drill barge was not displaying lights of the requisite sizes and in the required positions in that the lights on the drill barge No. 3 could not be seen for more than one-half to three-quarters of a mile."

Rule 8, paragraph 1, Rules of the Supervising Inspectors, reads: "Vessels intending to pass dredges or other types of floating plant working in navigable channels, when within a reasonable distance therefrom and not in any case over a mile, shall indicate such intention by blowing the passing signal prescribed in the local pilot rules for vessels under way, which shall be answered in the usual manner from said plant if the channel is clear and the approaching vessel may pass on the course indicated; otherwise the floating plant shall sound the alarm or danger signal and the approaching vessel shall slow down or stop and await further signal from the plant."

No passing signal was blown by the Marian as required by this rule. Captain Davidson testified, "I guess I should have given a passing whistle." Relative to the time when whistles were blown, Captain Davidson testified that after taking the wheel upon seeing the drill barge he brought the Marian "a little more to the west" and "as I got a little closer * * * blew several short whistles, which is known as a danger signal. * * * I should judge we were about half a mile away or in that neighborhood." The witness Peter Calugan, called by respondents, testified that he was bargeman on the last barge of the tow; that he was asleep in the cabin when the whistle woke him up; that there were four or five blasts; that he just put his pants on and went out the cabin and saw the drill barge about the length of the barge away. The witness Sutter in reply to a question, "Were any signals blown?" answered, "Yes, to give warning to see if there was any light to be shown on a buoy," but was not asked and did not testify with respect to the location of the Marian at that time. William Wickberg, a witness for libelant, testified that he was watchman on the drill barge; that he did not observe the Marian and her tow approaching until just prior to the collision; that he went into the cabin "just a few minutes before the accident" and while there "heard the Diesel engine" of the tug; that he then went out to see where it was and "discovered it was almost broadside * * *. 100 to 150 feet away"; that he "was standing right up near the end" when he heard the Marian blow three whistles "just before she struck." The witness Sutter testified that the Marian was "about 300 feet" away when it passed the drill barge. Hans Christensen, general superintendent of appellant, testified that it would take about two days to replace the lost buoys; that it was not the intention to replace them until the hole then being drilled was completed, which would require about a day and a half to finish. The buoys in use upon the drill barge were of such size that when the velocity of the tide was strong they would become submerged, and the buoys remaining appear to have been so submerged at the time of collision.

Rule 11 of the Supervising Inspectors provides: "Breast, stern and bow anchors of floating plant working in navigable channels shall be marked by barrel or other suitable buoys. By night approaching vessels shall be shown the location of adjacent buoys by throwing a suitable beam of light from said plant on the buoys until the approaching vessel has passed * * *."

The outstanding facts in this case are that the collision occurred between a tow in charge of a tug and a barge at anchor in midchannel with a half a mile or more of space for safe navigation on either side. The barge was not at the time complying with the rules respecting the display of buoys. The tug did not sound a passing signal, as also required by the rules. Both the captain of the tug and his assistant knew of the location of the drill barge, its purpose, and generally how it must be anchored. Had the master of the tug been unacquainted with the location of the drill barge, otherwise than appeared from its lights as observed by the approaching vessel, and had given the requisite passing signal, then in the absence of a display of proper lights by the barge on requisite buoys no liability would attach to the passing vessel in the absence of proof of gross negligence upon its part contributing to a collision.

The serious question in this case is, not whether the cause or a contributing cause of the collision with the resultant damages was the fault of the barge, but whether the tugboat was so operated under known conditions that it was solely responsible for the collision, notwithstanding the failure of the barge to comply with the regulations.

 In case of a collision between a moving vessel and one at anchor in a proper place showing requisite lights, the burden of proof to show absence of negligence is upon the moving vessel. United States v. King Coal Co. (C. C. A. 9) 5 F.(2d) 780; The E. S. Atwood (C. C. A. 2) 289 F. 737.

The evidence supports the conclusion and finding of the court below that the collision was occasioned by negligence both of the tugboat and the barge. The Perseverance (C. C. A. 2) 11 F.(2d) 527.

The law is well settled that when both vessels are in fault the damages are to be equally divided, irrespective of the degree of fault. The Margaret (C. C. A. 3) 30 F.(2d) 923; Hughes on Admiralty, p. 312; Benedict on Admiralty (5th Ed.) vol. 1, p. 490.

Following the filing of the memorandum decision, counsel for libelant filed a petition for reargument, stressing as the first reason advanced therefor, "That the question of unequal division of damages was never raised in the case at any time and consequently no argument on that point was presented. * * *" The reply to this portion of libelant's petition contains the statement "that if libelant feels the decision of this Honorable Court is contrary to law, libelant has its proper remedy by appeal." Because of this position taken by respondent, it is contended by appellant and cross-appellee that in the event the interlocutory decree is modified by apportioning the damages equally, that such appellant should be allowed its costs on the appeal. This contention is well taken.

The interlocutory decree is modified by allowing the libelant one-half in lieu of one-fifth of the damages arising out of the matters set forth in the libel herein. Appellant and cross-appellee is allowed its costs on appeal.

The cause is remanded for further proceedings in conformity herewith.