276 F.2d 745
 PACIFIC TOW BOAT COMPANY, E. W. Stuchell, William D.
Carpenter, Harry W. Stuchell, Jr., M. A. Wyman, D.
E. Wyman and M. H. Wyman, Copartners
Doing Business as Eclipse
Lumber Co., Appellants,
v.
STATES MARINE CORPORATION OF DELAWARE, Appellee.
 No. 16374.
 United States Court of Appeals Ninth Circuit.
 Feb. 9, 1960.
 
 Bogle, Bogle & Gates, Edward C. Biele, Claude E. Wakefield, Seattle, Wash., for appellant.
 Summers, Bucey & Howard, Charles B. Howard, T. F. Paull, Seattle, Wash., for appellee.
 Before MAGRUDER, HAMLEY and MERRILL, Circuit Judges.
 HAMLEY, Circuit Judge.
 
 
 1
 This is a collision case brought in admiralty involving the steamship SS Cotton State, the tug Lea Moe, and the barges Eclipse No. 15 and Eclipse No. 25. The accident occurred when No. 15, which had just been towed to the side of the moored Cotton State, drifted into the latter's slowly moving propeller.
 
 
 2
 The trial court awarded States Marine Corporation, owner of the Cotton State and libelant in this action, damages in the sum of $22,500.[1] The cross libel of the personal respondents named in the caption of this cause, owners of the barges, against States Marine Corporation was dismissed. They were, however, awarded judgment against The Pacific Tow Boat Company, owner of the tug Lea Moe, in the amount of $9,789.25, plus any amount they were required to pay to States Marine Corporation under the decree.
 
 
 3
 Pacific and the personal respondents jointly appeal. Three specifications of error are urged, as follows: (1) The court should not have applied the admiralty law presumption of fault against a moving vessel which strikes a stationary one; (2) the court erred in finding that those on the Cotton State were not negligent or contributorily negligent; and (3) the finding that the tug allowed No. 15 to strike the propeller is clearly erroneous.
 
 
 4
 On the evening of January 10, 1957, the Cotton State, a vessel 438.9 feet in length, docked in Everett, Washington, after a trip from Seattle. It was moored by lines to the south side of Port Dock No. 1, with the port side of the vessel against the pier and its stern offshore. Docking of the vessel was completed at 6:35 p.m. In about five minutes a standard warning sign and flashing light were displayed at the stern, and the jacking gear of the Cotton State was engaged. This cuased the propeller to turn slowly, making a full revolution about every seven or eight minutes. Activation of the jacking gear was normal practice and was designed to cool the vessel's engines slowly, thereby avoiding damage.
 
 
 5
 It was then dark, sunset having occurred at 4:29 p.m., but visibility, aided by the vessel's lights, was good. The weather was fair, a light southeasterly wind was blowing, and it was low tide.
 
 
 6
 At about the time the jacking gear of the Cotton State was engaged, the tug Lea Moe came alongside, towing two barges in tandem. The tug is a dieselpowered vessel 60.9 feet long. Each of the barges, with No. 25 ahead of No. 15, were 110.4 feet long and 37.9 feet wide. A short hawser extending eight to ten feet over the stern of the tug was attached to a stanchion at the forward starboard corner of No. 25. There were coupling lines fastened between the two corner stanchions aft on No. 25 and extending to the two forward corner standchions on No. 15. The two barges were close-coupled with a foot or two of clearance between them. The tug was burning red and green side lights and towing lights on the mast. There were no lights or lanterns burning or carried on either barge.
 
 
 7
 Each of the barges was loaded with lumber which was to be taken aboard the Cotton State. The lumber was piled ten to fourteen feet high, stowed out to the sides of the barges and in about ten feet from each end. The tug and barges were brought to stop at a point where the forward end of No. 25 was from 182 to 188 feet from the stern of the Cotton State. The master of the tug then signaled to the chief mate of the Cotton State for a mooring line. A line was passed down to one of the tug's deckhands who was then on the forward deck of No. 25. He attached the line to the starboard forward stanchion on that barge. It was then drawn taut and secured on a cleat on the cabin deck of the Cotton State opposite the forward stanchion on No. 25.[2]
 
 
 8
 An unidentified man who was aboard the Cotton State[3] then told the master of the tug that he wanted No. 15 moved forward to the number two hatch and No. 25 moved aft to the number four hatch. This made it necessary for the tug to reverse the positions of the barges. The towing hawaser of the tug was therefore cast loose and the tug proceeded towards the rear barge.
 
 
 9
 The two barges held by the one line from the Cotton State, as described above, then drifted sideways towards the vessel. No. 15 came under the stern counter of the Cotton State and collided with the revolving propeller. This occurred about five minutes after the tug and barges had come alongside. Two or more blades of the propeller struck the port side of No. 15. The tug thereupon towed No. 15 from under the stern and to a place where it would not sink.
 
 
 10
 The trial court found that the tug and its owner, Pacific, were at fault and negligent in three particulars in causing and contributing to cause the collision of No. 15 with the propeller of the Cotton State.[4] The barge No. 15 was found to be at fault and negligent in not having navigation lights displayed and burning on the aft end of No. 15. The court found that appellants failed to show that the absence of such navigation lights was not and could not have been a proximate cause of the collision. It was further found that the faults of No. 15 were occasioned by the primary negligence of the tug and its owner-operators. The trial court also found that the Cotton State was not negligent or contributorily negligent.
 
 
 11
 Under their first specification of error appellants argue: (1) the measure of the trial court's decision is 'no more than' an application of admiralty's presumpation of fault in favor of a stationary vessel damaged by one under way; and (2) such a presumption does not apply here because the moving vessel (No. 15) was safely at rest and was under the control of those on the moored vessel (Cotton State), the crew of which had participated in securing the barge to the vessel before the barge drifted into the propeller.
 
 
 12
 We cannot agree that the basis of the trial court's decision is 'no more than application of admiralty's presumption of fault. * * *' Of the three findings of fault and negligence on the part of the tug and its owners held to have been proximate causes of the collision, as quoted in footnote 4, only the first purports to give application to admiralty's presumption of fault. The other two findings pertain to the failure to place navigation lights and have a lookout posted on the aft end of No. 15.
 
 
 13
 The finding that lights were not placed on the aft end of No. 15 is not questioned by appellants. Nor do they challenge the trial court's ruling that such lights were required by applicable law and regulations.[5] It being established that appellants were guilty of a statutory fault before a collision, the drastic and unusual presumption known as the 'Pennsylvania' rule must be given application.[6]
 
 
 14
 Under this rule the vessel guilty of violating a statute or regulation pertaining to equipment or navigation must, in order to escape liability, prove not only that the fault shown probably did not contribute to the collision but also that it could not have contributed to it.[7] The words 'could not have,' as used in this rule, do not require the vessel guilty of a statutory fault to prove that its fault could not by any stretch of the imagination have had any causal relation to the collision no matter how speculative, improbable, or remote. Seaboard Tug & Barge, Inc. v. Rederi, AB/DisA, 1 Cir., 213 F.2d 772, 775. But they do cast upon such vessel the burden of establishing that the violation could not reasonable be held to have been a proximate cause of the collision. States Steamship Co. v. Permanente Steamship Corp., supra, 231 F.2d at page 87.
 
 
 15
 The trial court found that appellants had failed to maintain this burden and so had not overcome the presumption. Appellants contest this finding, calling attention to testimony which in their opinion indicates that lights on No. 15 were not needed for observation from the Cotton State.
 
 
 16
 If this evidence was such as to call for a finding of fact to that effect, appellants maintained the burden cast upon them by the Pennsylvania rule. This court has twice held that noncompliance with applicable rules regarding lights could not possibly have caused the accident where persons aboard the other vessel actually saw what needed to be seen in order to avoid the accident.[8]
 
 
 17
 There is considerable evidence given by persons aboard the Cotton State to the effect that visibility was 'good'. The trial court made a finding to that effect. There was also testimony by these witnesses that the tug and the two barges were seen as they came alongside. Boatswain Dusevoir, who secured the line on the Cotton State after it had been attached to a stanchion on No. 25, testified that 'it may have been possible' to determine from that point where the stern end of No. 15 was with reference to the stern of the Cotton State. He did not, however, make that determination.
 
 
 18
 The chief officer, who was present at the point where the line was secured on the Cotton State, knew that there was another barge behind the forward barge because he saw a pile of lumber behind the first barge. He testified, however, that he could not determine where the stern end of the after barge was with respect to the stern of the vessel because the 'lumber was too high.' He further testified that it was very dark at that time 'but you could see everything around by the lights on the ship.' No one had informed the chief officer as to the length of the barges.
 
 
 19
 Appellants argue that the chief officer's failure to see the aft end of No. 15 was not because of the lack of lights on her, but because lumber piled on the deck of No. 15 to a height of fourteen feet obscured a view of its stern. But, had the required lights been showing, the piled lumber would not have prevented the chief officer from determining the location of the stern of No. 15. The regulations cited in footnote 5 require that the white lights on each corner of the stern of the aft barge be 'so placed as to show all around the horizon.' This means that the lights must be so placed as to show in all directions above the cargo.
 
 
 20
 Had lights been showing at the stern of No. 15, the chief officer might have been alerted to the possible danger; He could then have acted to avert the damage by directing a different mooring operation and by ordering that the propeller be stopped.
 
 
 21
 Taking into consideration all of the evidence bearing upon the matter, we conclude that the trial court's finding to the effect that appellants had not maintained the burden placed upon them by the Pennsylvania rule is not clearly erroneous. It follows that the finding with respect to the failure to show lights on the barges is alone sufficient to establish fault and negligence on the part of appellants, constituting a proximate cause of the collision.
 
 
 22
 But, as noted above, the trial court also based a finding of fault and negligence upon the presumption arising under admiralty law with respect to collisions between a moving and a stationary vessel.[9] Appellants argue that such a presumption does not apply under the circumstances of this case and, in the alternative, that such presumption was rebutted by the evidence.
 
 
 23
 States Marine Corporation, as libelant, had the initial burden of proof to show that the Cotton State was damaged because of appellants' negligence. The Clara, 102 U.S; 200, 26 L.Ed. 145. Under normal circumstances, however, when a libelant proves that its vessel while moored and stationary was struck by a moving vessel, a presumption of negligence on the part of the moving vessel arises sufficient to establish a prima facie case.[10]
 
 
 24
 Appellants contend, however, that the presumption does not apply where the colliding vessels are not strangers and some voluntary relationship exists between them. In this case the relationship relied upon arises from the fact that No. 15 had cargo which was to be loaded on the Cotton State, and the barge was in process of being moored to the Cotton State at the time the accident occurred.
 
 
 25
 The fact that No. 15 was in process of being moored to the vessel which was damaged by the collision would not, standing alone, prevent application of the presumption. On the contrary, such a circumstance definitely calls for its application.[11]
 
 
 26
 The other arguments advanced by appellants with regard to this presumption tend to show not that the presumption is inapplicable but that it has been rebutted. In this connection appellants assert that persons aboard the Cotton State had participated in the efforts being made to moor No. 15 to the Cotton State and were actually responsible for its drifting into that vessel's propeller.
 
 
 27
 There is evidence tending to support appellant's theory of how the accident happened. There is other evidence, however, which tends to a contrary conclusion. In this latter category falls some of the testimony of the tug master. He testified that while he stopped the scows where an unidentified man on the Cotton State indicated, he determined for himself that he was then far enough forward for the barges to clear the stern of the Cotton State. The trial court found on all of the evidence that the place for fixing the line was determined by those aboard the tug and tow.
 
 
 28
 In our view the trial court's implicit finding of fact, that appellants had failed to overcome the presumption of negligence, is not clearly erroneous.
 
 
 29
 Under their second specification of error appellants argue that the trial court erred in finding that those on the Cotton State were not negligent or contributorily negligent.
 
 
 30
 Much of the argument under this point covers factual matters already discussed. Some contentions advanced on this branch of the case, however, have not been discussed above. It is asserted that the propeller was started without clearance from a lookout on the Cotton State. But it was not established that the full length of the tug and barges could have been ascertained from one aboard the Cotton State before the propeller was put in motion. Even if it could have been, an observer aboard the vessel having that information could hardly have anticipated that the barges would be temporarily moored in such a way as to permit the rear barge to drift into the stern of the Cotton State.
 
 
 31
 It is contended that no effort was made to minimize damage after the collision by promptly ordering that the propeller be stopped. The jacking gear, however, was designed to cut off automatically in the event of an interference with the propeller. It did so after about three blades had struck the barge. The chief officer on the Cotton State could have reasonably assumed that this automatic cutoff would stop the propeller at the earliest possible moment and before any signal to the engine room could produce results.
 
 
 32
 Appellants also argue that the only possible explanation for the collision is that those on board the Cotton State must have failed to control the mooring line, thereby permitting the barges to pivot on the side of the ship. The captain of the tug testified that the barge could not have pivoted unless there was slack in the line. A deckhand in the tug testified that after the collision the line was still intact at the point where it was secured to a stanchion on No. 25.
 
 
 33
 The trial court was not required to accept the tug master's opinion as to the only way in which the accident could have occurred. There was no evidence that the line became loose at the point where it was secured to the Cotton State. The trial court could well conclude that, considering the weight and length of the barges and the existing wind, a single line extending downward at an angle for more than forty feet to the starboard stanchion on the front of the leading barge could swing and give enough to permit the port side of the second barge to come into contact with the propeller 180 feet astern. The trial court could also find on the evidence in this case that the responsibility for relying upon a single line so placed was solely upon the master of the tug.
 
 
 34
 The trial court, in our opinion, did not err in finding that those on the Cotton State were not negligent or contributorily negligent.
 
 
 35
 Under their final specification of error appellants argue that the trial court's finding that 'the rear or trailing barge No. 15 was allowed by the tug Lea Moe to drift under the stern counter and to collide with the slowly revolving propeller,' is clearly erroneous.
 
 
 36
 Our conclusion that the trial court did not err in this regard follows from what has just been said in discussing the second specification of error.
 
 
 37
 We have not overlooked appellant's contention, perhaps applicable to all the specifications of error, that a determination that a party is or is not negligent is a conclusion of law. Appellants argue from this that such a trial court determination is not protected by the 'clearly erroneous rule' announced in McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 8, 99 L.Ed. 20, and that this court should make its own independent determination on the question of negligence. The view thus presented, as appellants point out, has long prevailed in the Second Circuit, and has not been modified in that circuit since McAllister was decided. Verbeeck v. Black Diamond Steamship Corp., 2 Cir., 269 F.2d 68, 70, and cases there cited.
 
 
 38
 In the McAllister case the Supreme Court dealt specifically with a 'finding of fact' that the master of the ship was negligent. It was with respect to this finding that the court there held that 'no greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure.' Since that decision this court has uniformly regarded determinations as to negligence made in admiralty cases as findings of fact which are not to be overturned unless clearly erroneous.[12]
 
 
 39
 It is true that any determination as to negligence requires the testing of particular facts against a predetermined standard of conduct. The fixing of that standard is a jural act. To this extent a question of law is involved, and hence a conclusion of law is required, in any determination as to negligence. Nothing said in McAllister or in any of our previous decisions was intended to limit the scope of review in so far as the fixing of the applicable standard of conduct is concerned.
 
 
 40
 The standards of conduct here applied by the trial court, as we understand them, comport fully with accepted legal principles. The findings of fact whereby those standards were given application in this case are not clearly erroneous.
 
 
 41
 Affirmed.
 
 
 
 [1]
 The decree runs jointly and severally against the tug Lea Moe and the barge Eclipse No. 15, in rem, and against the principals upon the respective release and cost bonds filed by their owners, and Pacific Tow Boat Company, in personam
 
 
 [2]
 The cabin deck of the Cotton State was about ten feet above the top of the lumber which was piled from ten to fourteen feet above the deck of the barge. It follows that the cleat to which the line was secured on the Cotton State must have been from twenty to twenty-four feet above the stanchion to which it was fastened on No. 25. Since the line was secured to the starboard stanchion on the barge and proceeded up at the indicated angle to the cabin deck of the Cotton State, it must have been more than forty feet long
 
 
 [3]
 This man was not a member of the crew of the Cotton State. The chief officer of that vessel assumed that he was an employee of the company which had supplied the lumber stowed on the barges
 
 
 [4]
 The court found:
 '(a) That the tug Lea Moe and its tow, being moving vessels, collided with the slowly revolving propeller of the moored and stationary SS Cotton State.
 '(b) That the tug Lea Moe and respondent Pacific Tow Boat Company were negligent in failing to place and assist in placing, and seeing that there was placed upon the after end of barge No. 15, a navigation light, as required, under conditions then existing, by applicable law and regulations.
 '(c) That the tug Lea Moe and respondent The Pacific Tow Boat Company were negligent for not having a lookout posted on the after end of barge No. 15.'
 
 
 [5]
 See 33 U.S.C.A. 157 and 171, and 33 C.F.R. 80.14 and 80.16(a), (b) and (h). In their opening brief appellants state that they 'do not concede the tug or scows were guilty of any fault with respect to lights or lookout.' They do not, however, state any reason why they should not be held to have violated the statutes and regulations pretaining to lights
 
 
 [6]
 Named after The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, in which the rule was first announced
 
 
 [7]
 See Gilmore and Black, Admiralty, 404-405 (1957). The Pennsylvania rule has been consistently applied in this circuit, as indicated by the cases cited in States Steamship Co. v. Permanente Steamship Corp., 9 Cir., 231 F.2d 82, 86
 
 
 [8]
 Van Camp Sea Food Co. v. Di Leva, 9 Cir., 171 F.2d 454, 456; The Redwood, 9 Cir., 81 F.2d 680, 686-687
 
 
 [9]
 The trial court also found fault and negligence consisting of the failure to post a lookout on the aft end of No. 15, but we do not find it necessary to discuss this finding
 
 
 [10]
 This presumption was first announced and applied in The Louisiana, 3 Wall. 164, 70 U.S. 164, 173, 18 L.Ed. 85. It has previously been recognized and applied by this circuit. See Sehlmeyer v. Romeo Co., 9 Cir., 117 F.2d 996; The Marian, 9 Cir., 66 F.2d 354, 356
 
 
 [11]
 The Chalmette, D.C.S.D.N.Y., 52 F. 174; The British Empire, D.C.S.D.N.Y., 24 F. 493; Griffin on Collision, 385 (1949)
 
 
 [12]
 Albina Engine & Machine Works, Inc. v. American Mail Line, Ltd., 9 Cir., 263 F.2d 311, 314; Amerocean Steamship Co. v. Copp, 9 Cir., 245 F.2d 291, 293; City of Long Beach v. American President Lines, Ltd., 9 Cir., 223 F.2d 853, 855. The Sixth Circuit has followed the same practice. Imperial Oil, Limited v. Drlik, 6 Cir., 234 F.2d 4