## THE CHESTER O. SWAIN.

## UNITED STATES v. STANDARD SHIPPING CO.

## STANDARD SHIPPING CO. v. UNITED STATES.

No. 264.

Circuit Court of Appeals, Second Circuit.
April 8, 1935.

Leo J. Hickey, U. S. Atty., of Brooklyn, N. Y. (Charles E. Wythe, Sp. Asst. to U. S. Atty., of New York City, of counsel), for appellant and cross-appellee.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (W. H. McGrann, Harold B. Finn, and E. F. Gilligan, all of New York City, of counsel), for appellee and cross-appellant.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

Appeals have been taken by the United States, owner of the steamship Scantic, and Standard Shipping Company, owner of the steamer Chester O. Swain, from a final decree in admiralty awarding damages growing out of a collision between these vessels and dividing the damages.

The collision occurred on the night of March 3, 1930, at about 8:15 o'clock, in the Mississippi river abreast of what is known as Goodyear's Landing, at a point about 600 feet out from the docks and below the sharp bend in the river at Algiers Point. Goodyear's Landing is on the northerly or left bank of the river (looking downstream) at the city of New Orleans. The anchorage grounds prescribed by the Board of Commissioners of that port are on the right side of the river and below the Board's sign which is set on the bank opposite the American Sugar Refinery.

The Swain was an oil tank steamer 477 feet long with 60 foot beam, carrying a cargo of about 10,500 tons of crude oil. She had proceeded down the river from Baton Rouge and, after rounding the sharp turn at Algiers Point, had crossed over to a course lying about 600 feet from the left bank. While going downstream on that course, she collided with the Scantic, which lay at anchor about 600 feet out from the New Orleans docks, and both vessels suffered damage.

On March 2, 1930, the Scantic was moored at the Charbonnet Street Wharf at New Orleans. On the evening of that day a fire broke out in a neighboring cotton warehouse and spread to the Scantic, which was pulled out into the stream and anchored 600 feet off the New Orleans shore. Two bow anchors were put down, one to the starboard and the other to the port side of the ship, each with about 45 fathoms of chain. The place where she was anchored was in the navigable channel.

Apparently the fire on the Scantic had been extinguished by 4 a. m. on March 3, but she remained at the above anchorage up to the time when the collision occurred, although there was discussion during March 3 about moving her to the regular anchorage grounds and the master had received a message that a tug would be sent to shift her the following morning.

As a result of the fire the regular navigation lights of the Scantic had been damaged and they were not replaced during March 3, as might have been done. Instead of doing this, she rigged temporary lights consisting of two oil lanterns, one tied to the jack staff at the bow of the vessel, and the other placed on the awning spreader aft. She also installed temporary cluster lights of the kind ordinarily used for working cargo, each having four good-sized electric bulbs. One of these was made fast to the center of the bridge deck; a second was on the forward part of the boat deck and so placed as to light No. 3 hatch; the third was at the after end of the boat deck so as to light No. 4 and No. 5 hatches, and the surrounding deck; and the fourth was on the starboard side near No. 4 hatch so placed as to light the pilot ladder which led down to a motorboat tender that was standing by the vessel to lend aid in case the fire should break out again. Likewise a watch was maintained aboard the steamer so as to guard against such an occurrence.

The District Court held the Swain at fault for (1) failing to maintain a vigilant lookout and (2) failing to maneuver promptly and properly so as to avoid collision with the Scantic. It held the Scantic also at fault for (1) failing to display regulation lights and (2) failing to have on her bow a lookout who could give warning of the approach of vessels and, if needful, could avert a collision by paying out anchor chain.

The Swain argues that she ought to be excused for the collision because the Scantic was negligently anchored in the fairway, where she had no right to be, instead of at the anchorage grounds, and was not displaying regulation lights. While the proctors for the Scantic concede that she "was anchored outside the prescribed anchorage grounds and in the navigable channel," they say that she was so placed because of fear lest the fire might not have been completely extinguished and might start up and spread to other ships if she should anchor at a place where numerous vessels were lying. The trial judge thought that there was sufficient ground for anxiety to justify the Scantic in remaining for a time where she was. He imputed fault to the Swain in not maintaining a good enough lookout sooner to discover the presence of the Scantic, even though the latter was moored in a somewhat unexpected place.

The steamship Mount Park passed down the river just before the Swain and saw the cluster lights of the Scantic amidships when about three-fourths of a mile away. While she at first had difficulty in picking up the lights of the Scantic and seems to have confused her cluster lights with lights on the shore, she was on a course farther away from the New Orleans side of the river than that of the Swain and the lights of the Scantic would seem to have been harder for her than for the Swain to distinguish from shore lights.

The master of the Mount Park testified that he could distinguish the Scantic's lights from the shore lights at a distance of from one-half to one-fourth of a mile. It is true that he already knew that the Scantic was anchored in the fairway. Because of this knowledge it is said that he could pick out the lights of the latter more readily than could the Swain. The latter insists that the small lantern on the jack staff of the Scantic gave but a dim light and that the cluster lights on the bridge deck were hidden by the mast, four booms used for loading, the windlass engine, and other fixtures. But the night was clear and the Swain, when coming down the river, ought to have discovered both the lantern hung on the jack staff and the clusters in front of the bridge and to have been able to distinguish them from shore lights. They were 600 feet out from the shore and the Scantic could hardly have swung in the current in such a way that at all times the mast and rigging concealed the forward cluster of lights from a vessel rounding Algiers Point and then coming down toward the Scantic parallel with the shore. According to the testimony for the Swain, she saw the Scantic's lights for four minutes before the collision, but instead of going to starboard and avoiding her, she first ordered her engines full ahead, then stopped them, then backed, and finally again stopped and helplessly floated down in the current directly into the Scantic. We think upon the evidence that the trial court was justified in holding that the lights of the Scantic were sufficient to warn the Swain of her position in time enough to avert a collision, and that there was no excuse for the vacillation of the Swain's pilot. He should have noticed the lights of the Scantic before he did, and even after he saw her he had sufficient opportunity, if he had navigated properly, to pass to her port and escape from danger.

The contention that the lights of the Scantic were concealed by the mast and rigging because she lay dead ahead of the

Swain will not stand analysis. Even though the Scantic rode on two anchors she was bound to swing in the current and the Swain was not at all times on a course parallel to her heading.

It is argued on behalf of the Swain that after she first distinguished the lights on the Scantic from those on the shore, there was no chance, in the limited time available, so to change her course as to pass to the port of the Scantic. This position is sought to be fortified by extracts from Knight's Modern Seamanship (9th Ed. at page 346), which, in describing the movement of a vessel going ahead under a hard-over-helm, says that: "The stern does not finally clear the line of the original course until it has covered from two to three lengths * * *."

The author in the passage quoted was dealing with turning circles. But the situation that confronted the Swain did not involve navigation in anything like a circular course. It required a course only about 50 feet farther away from the New Orleans shore than the one she was on, if she was to avoid a collision with the Scantic. We believe she had time enough to have changed her course to that extent, had her helmsman acted with promptitude and decision instead of with hesitation and vacillation.

There would seem to be more doubt about the faults of the Scantic than those of the Swain. It is argued that the trial court was unduly severe in requiring a lookout on the Scantic's bow in order to warn vessels which might negligently run into her, and that the Scantic could not have been expected to pay out chain in extremis. She did have an anchor watch consisting of two officers and two seamen, and the latter were on deck at the time of the collision though no lookout was stationed on the bow. But, in any event, the Scantic was violating the rules regulating lights. Those she had were not as high as the requirements and were placed differently. She had the burden of showing that her makeshift lights could not have been replaced by proper ones, were not confusing to the Swain, and did not contribute to the collision, and that the accident would have still occurred if her lighting had conformed to law. Inasmuch as she was moored in an unexpected place, and not on the anchorage grounds, it was specially important for her to have regulation lights. We think she did not establish that her statutory fault was not contributory, and while the lights she installed ought to have

been discovered by the Swain in time to prevent the collision, it cannot be said that better and more conventional lights would not have got the attention of the Swain sooner than those which the Scantic rigged and would not have averted the trouble.

The decree is affirmed.