## P. DOUGHERTY CO. v. UNITED STATES.

## UNITED STATES v. P. DOUGHERTY CO.

### THE WILMINGTON.

### THE ANNAPOLIS.

### THE CHEWINK.

### THE DUNMORE.

### No. 272, Docket 20988.

Circuit Court of Appeals, Second Circuit.

June 3, 1948.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for appellant.

J. Vincent Keogh, U. S. Atty., of Brooklyn (Nicholas J. Healy, 3d, and Frank P. Cox, both of New York City, of counsel), for appellee.

Before AUGUSTUS N. HAND, CHASE, and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The P. Dougherty Company, owner of the tug Dunmore and the barges Wilmington and Annapolis, sued the United States in admiralty for damages to the barges alleging a negligent collision by the government vessel Chewink with them. The United States, owner of the Chewink, filed a cross suit against P. Dougherty Company for damages sustained by the Chewink in the collision through the negligence of Dougherty's tug Dunmore which had the barges Wilmington and Annapolis in tow. Judge Inch dismissed the libel of P. Dougherty Company against the United States. He granted an interlocutory decree to the latter upon its cross-libel with a reference to a master to report the damages of the Chewink. P. Dougherty Company appealed from each decree. Both decrees of the trial court were right and should be affirmed.

The U.S.S. Chewink is a submarine rescue vessel of the United States Navy equipped for diving and other rescue operations in connection with submarines. On March 27, 1943, she was moored in Long Island Sound while engaged in diving operations on what had been reported to be the wreck of an enemy submarine. The

work continued until dark. About 9 P.M. she dropped her anchor in about 135 feet of water at a point approximately in the middle of Long Island Sound. There was ample room for any ship to pass her. She was at all times brilliantly lighted, having in addition to several deck lights a cluster of two or more white lights (which showed as one) located on the mainmast in the after part of the ship about 48 feet above the water line and visible all around the horizon; a portable white light located in the forward part of the vessel about 35 or 40 feet above the water line and visible all around the horizon; a red aircraft warning light on top of the mainmast about 73 feet above the water line; a white light equipped with a light blue globe located atop the jackstaff at the bow approximately 25 feet, 7 inches above the water line and visible all around the horizon, except for an arc of one or two points on either side of dead astern, and a white light equipped with a light blue globe located atop the flagstaff at the stern, approximately 20 feet, 9 inches above the water line and visible all around the horizon, except for an arc of one or two points on each bow. Neither the red or green side lights nor the range lights were lit at any of the times in question. The visibility was such that the Chewink could be plainly seen at a distance of about two miles.

In addition to the foregoing the trial court made the following findings:

"11. On the night of the collision which is the subject matter of these actions, the 'Dunmore' was proceeding in a general westerly direction through Long Island Sound, bound for Whitestone and New York Harbor. She had in tow, on manila hawsers, in tandem formation, the barges 'Annapolis,' 'Wilmington' and 'Chehaw,' in that order, each barge being light. The hawser from the 'Dunmore' to the 'Annapolis' was over 1300 feet in length; the hawsers between the 'Annapolis' and the 'Wilmington' and between the 'Wilmington' and the 'Chehaw' were each about 1200 feet long. The length of the entire flotilla, measured from the stem of the 'Dunmore' to the stern of the 'Chehaw,' was more than 4,500 feet."

"14. While so proceeding, and at about 12:30 A.M. (March 28) the 'Dunmore's' mate sighted the 'Chewink's' white lights almost dead ahead and about two miles away. The 'Dunmore' continued ahead toward the 'Chewink' for about ten minutes without reducing speed or altering course, during which time the 'Chewink's' bearing remained constant. Then the mate altered course from W 1/2 N (Magnetic) to NW (Magnetic), thereby putting the 'Chewink' about three points on the 'Dunmore's' port bow, but did not reduce the 'Dunmore's' speed. This change of course was made when the 'Dunmore' was only about 300 yards from the 'Chewink' and resulted in the tug cutting across from the starboard bow to the port bow of the anchored vessel, clearing the latter's stem by a margin of approximately 300 feet. The mate then called the captain, but by the time he arrived on the bridge and ordered the tug's engine speed reduced the 'Annapolis' was almost up to the 'Chewink.'

"15. This sudden change of course on the part of the tug, under the existing conditions of wind and tide, resulted in the tow getting out of line and the port side of the 'Annapolis' collided with the 'Chewink's' stem. Then, after the tug had pulled the 'Annapolis' clear, the hawser between that barge and the 'Wilmington' parted as it rubbed against the 'Chewink's' stem, causing the 'Wilmington' and the 'Chehaw' to break adrift from the rest of the flotilla. The 'Wilmington' then collided bow on with the 'Chewink's' starboard side and the 'Chehaw' passed the anchored vessel safely on her starboard side."

"17. The 'Dunmore's' mate, if he had exercised reasonable care, would have been able to tell in ample time that the 'Chewink' was not moving but was anchored. Reasonable observation of the 'Chewink' at such a distance by the 'Dunmore's' mate would plainly have shown him the necessity for giving the anchored vessel a sufficiently wide berth. He was not misled by the 'Chewink's' lights.

"18. If the 'Dunmore's' mate had not made the last minute change of course from W 1/2 N to NW and had kept the tow in line, the 'Dunmore' and her tow could

have passed the 'Chewink' safely to the southward, as she should have done under the existing conditions of wind and tide.

"19. Those on the 'Chewink' observed the approaching tug when she was a mile or more away. Since the anchored vessel was brilliantly lighted, with miles of safe water on either side of her, they could do nothing but wait and expect that the tug and tow could be prudently navigated and would pass her safely."

The judge delivered an opinion and made the above findings of fact upon which he concluded that the collision was due solely to the negligence of the Dunmore and the P. Dougherty Company and that there was no fault on the part of the Chewink.

The appellant, P. Dougherty Company, argues that the collision was due in whole or in part to the neglect of the Chewink to display the lights required by statute for anchored vessels. Some failure to maintain fully the prescribed lights was borne out by the findings, but the inference that the appellant wished the court to draw that she therefore appeared to be a moving vessel is a non sequitur. The court found that she was brilliantly lighted, could be seen a long distance away, and that her running lights and range lights were not lighted. The suggestion of the expert Bagger that through a reflection of the white lights the green and red side lights might have appeared to be lighted was no more than a speculation. In short there was nothing to justify any belief on the part of the Dunmore that the Chewink was moving, as she in fact was not. Indeed her lights had but a slight variation from the prescribed regulation as to anchored vessels and certainly did not show in any respect that she was under way. We can see no excuse for the careless navigation of the Dunmore in going on with its long tow at a speed of 7 1/2 knots until it got so near the Chewink that it had to adopt the hazardous course of crossing the bow of the latter. The whole sound was available, the Chewink was seen long in advance, and the Dunmore was rightly held solely responsible for the accident. The mate's main excuse for his faulty navigation was that he was confused into believing that the Chewink's red and green lights were lit, but the judge did not credit his excuse and found that they were not lighted.

The appellant seeks to divide the damages on the ground that the Chewink should have paid out her chain but had she done this she would have obtained no certain means of avoiding a collision and indeed might have rendered damages from collision increasingly likely. We cannot hold that the Chewink when in extremis was under any duty to try such a doubtful expedient.

The decrees are affirmed.