AL JOHNSON CONSTRUCTION CO.
et al., Libellant,

v.

S.S. RIO ORINOCO and Trans-World
Carriers, Inc., Claimant-Respondent.

TRANS–WORLD CARRIERS, INC.,
Cross-Libellant,

v.

DREDGE ATLAS et al., Claimants-
Respondents.

No. 419 of 1960.

United States District Court
E. D. Pennsylvania.

Dec. 20, 1965.

Krusen Evans & Byrne, James F. Young, Philadelphia, Pa., for libellants.

Rawle & Henderson, Richard W. Palmer, Philadelphia, Pa., for claimant-respondent and cross-libellant.

KRAFT, District Judge.

On June 23, 1960, at or about 5:30 P.M. (1730) the S. S. RIO-ORINOCO, moving upstream struck the dredge ATLAS while the latter, spudded down, was dredging a new channel in the upper Delaware River, known as the New Enterprise Channel. The dredge owners filed a libel against the RIO-ORINOCO in rem and her owner in personam. The vessel interests answered and filed a cross-libel against the dredge in rem and her owners in personam.

After trial to the Court, oral argument and examination of the requests for factual findings, legal conclusions and briefs in support thereof, we make these

FINDINGS OF FACT

1. The libellants and cross-respondents, Al Johnson Construction Co. and Peter Kiewitt Sons' Co., Inc., corporations organized and existing under the laws of the states of Minnesota and Nebraska, respectively, were, at all relevant times, joint venturers doing business as Delaware River Dredgers and were the owners and operators of the dredge ATLAS.

2. Trans-World Carriers, Inc., the respondent and cross-libellant, a Liberian corporation with its principal place of business in Nassau, British West Indies, was, at all relevant times, the owner of the S. S. RIO-ORINOCO.

3. On June 23, 1960, and for some time theretofore, the libellants were engaged, under contract with the United States Corps of Army Engineers, in dredging a new channel in the upper Delaware River to a width of 400 feet and a minimum depth of 42 feet, to be known as the New Enterprise Channel.

4. The New Enterprise Channel overlapped a portion of the existing Mud Island Channel in an area opposite Andalusia, Pa. and Delanco, New Jersey. Mud Island Channel had a mean low water width of 300 feet and a minimum depth of 25 feet.

5. In addition to the dredge ATLAS, the dredge flotilla, all units of which were under libellant's operational control, consisted of a drill boat (HORNET), 3 tugs (NORTH STAR, JAMES A. and DOTSIE), a derrick ("3900") and a sweep.

6. The ATLAS was a dragline dredge 175 feet long and 70 feet wide, with a 200 foot boom extending from its bow. Its boom, dragline and appended clam shell bucket were controlled by a dragline operator. This dredge was equipped with 3 spuds, which were lowered into the river bottom to secure it when it was digging. One spud was located at the stern and another on each side. The spuds were raised and lowered by machinery aboard.

7. The sweep (a barge without means of self-propulsion) was also equipped with spuds to secure it in position. It was 100 feet long and 25 feet wide. Its function was to sweep the area already dredged by the ATLAS to verify the contract minimum depth of 42 feet, or, otherwise, to report any high spots encountered.

The sweeping operation was accomplished by a series of 5 bars, each 20 feet long and 3 inches in diameter, suspended to the desired depth over one side of the sweep by cables attached to a rig, which could raise or lower the bars as the sweep was moved sideways across the channel.

8. The HORNET (a barge incapable of self-propulsion) was used to drill holes in the river bottom for explosive charges.

9. The S. S. RIO-ORINOCO was an ocean-going ore carrier 657 feet long, 87.4 feet wide, with a dead weight of 35,000 tons.

10. On June 17, 1960, the Corps of Army Engineers gave written notice to all affected navigational interests of the presence of the HORNET and the ATLAS in the New Enterprise Range opposite Delanco, New Jersey. The notice

regarding the HORNET read in part, as follows:

"Drillboat will be anchored in the ship channel 24 hours per day. *Mariners are cautioned ,to slow down and proceed with care in this area.* Radio and radar transmitters should not be used while in the vicinity of this plant." (emphasis ours)

The notice further stated, in part:

"NOTE: The *west half of the 25-foot channel,* Mud Island Range, opposite the HORNET NO. 4 and the ATLAS, will be unobstructed by the plant and open for traffic at all times." (emphasis ours)

11. On June 23, 1960, about 2:04 P.M. (1404), the S. S. RIO-ORINOCO, inbound from Venezuela, having stopped first at Philadelphia to lighten cargo, departed therefrom for Morrisville, Pa., with a cargo of iron ore. Richard Rutherford, a licensed Delaware River Pilot, was in charge of navigation.

The draft of the vessel on departure upriver was 24 feet 6 inches. Then, and at all later relevant times, visibility was excellent and the weather clear and fine.

12. On its upstream voyage, the RIO-ORINOCO was escorted by 2 tugs, H. C. JEFFERSON and NORTH POINT. The tugs assisted the ship through the Delair Railroad Bridge and followed her to assist in docking at Morrisville.

13. Pilot Rutherford had read the notice issued by the Corps of Army Engineers, dated June 17, 1960, and was anticipating that the western half (150 feet) of the Mud Island Channel (300 feet) would be open for his transit past the dredge ATLAS and its flotilla.

14. Between 5:00 P.M. (1700) and 5:30 P.M. (1730) the tide was ebbing in the Mud Island Range and the ship was stemming an ebb tide of about 1½ knots.

15. About 5:00 P.M. (1700), after the RIO-ORINOCO had passed beneath the Tacony Palmyra Bridge, and had slowed her engines to pass several yacht clubs, Pilot Rutherford, from his observation point in the wheelhouse 85 feet above the water, mistakenly concluded that the ATLAS was in the center of the Mud Island Channel.

This observation was made when the ship was about one-half hour below the ATLAS and about 5 minutes below the intersection of the upper end of Torresdale Range with the lower end of the Mud Island Range, which was approximately 2 miles down river from the point of the subsequent collision.

At this point, Pilot Rutherford made a radio call to the ATLAS for clearance to pass and requested that the ATLAS move from the center of the channel. This message was relayed by the dredge ALAMEDA for transmission to the ATLAS because the ATLAS was on a different radio frequency from the RIO-ORINOCO. The ATLAS replied that there was plenty of room on the Pennsylvania (western) side of the channel and that the dredge was not going to move. At this time the RIO-ORINOCO was operating on a "slow" bell with an engine speed of 4½ knots and an over-the-ground speed of about 3 knots, as it stemmed the ebb tide of about 1½ knots.

16. When the RIO-ORINOCO entered the Mud Island Range Pilot Rutherford observed that the ATLAS was not on the center line of the channel, as he had earlier erroneously believed, but was approximately 50 feet east of the center line toward the New Jersey shore. He then concluded that he had at least 200 feet to complete the RIO-ORINOCO'S passage by the ATLAS, which he regarded as a "normal, natural passing situation" without abnormal hazards, absent the presence of other vessels in mid-channel.

17. Pilot Rutherford had, without difficulty, passed the ATLAS on numerous prior occasions, when it was in the same or a similar location.

18. Upon turning onto the Mud Island Range, Pilot Rutherford also observed another piece of floating equipment in view upriver (the sweep), which *appeared to him* to be right on the center

line of the channel with some overhang on either side. However, the sweep was then, in fact, 30 to 40 feet east of the center line and positioned about 500 to 600 feet downstream from the dredge on a direct line.

19. At 5:11 P.M. (1711) the RIO-ORINOCO shaped up on the Mud Island Range lights while in the vicinity of Buoy 22, increased her speed to "half ahead" (6 knots over-the-ground), and proceeded up the center line of the channel.

Pilot Rutherford continued the ship's speed at "half ahead" (6 knots over-the-ground) until 5:27 P.M. (1727), when he ordered a reduction to "slow ahead" (3 knots over-the-ground). This order was executed promptly by the engine room at 5:28 P.M. (1728), since ordinary orders from the bridge usually required from 45 to 60 seconds for execution by the engine room to avoid damage to the engines.

20. In prior passings of the ATLAS, Pilot Rutherford had reduced the speed of the RIO–ORINOCO to the slowest possible speed, or "dead slow ahead" to counter the effects of bank suction as much as possible.

21. By 5:15 P.M. (1715) the tug, JAMES A., had completed moving the sweep eastwardly toward the New Jersey shore to a point which was approximately 100 feet east of the center line of the Mud Island Channel and well clear of the intended course of the RIO-ORINOCO.

22. The ATLAS, with its boom downstream, was positioned opposite Buoy 29 and on the "200" west line of the New Enterprise Range, approximately 200 feet eastwardly from the westerly line of the Mud Island Channel at about station 53+500. The ATLAS never moved from this position prior to the collision.

23. When the RIO-ORINOCO reached Buoy C–27 at 5:26 P.M. (1726) it blew a two-blast passing signal on its whistle to the ATLAS which was not answered. Pilot Rutherford did not actually expect a reply from the ATLAS, because of his experience in 40 to 50 prior passings of the ATLAS, and his navigation of the RIO-ORINOCO was not affected in any degree by this lack of response from the ATLAS.

24. From his past experience Pilot Rutherford anticipated that his course in passing the dredge would cause his vessel to experience bank suction and a resulting sheer, because of shallow water on the bank which was west of the westerly line of the channel.

25. During a period of at least 20 minutes, and for a distance of about 2 miles before reaching the site of the collision, Pilot Rutherford had ample opportunity to anticipate, and to prepare his vessel for, all of the existing factors which would affect his navigation in passing the dredge flotilla.

26. After sounding her two-blast signal, and when she was about 1200 feet below the sweep, which was then about 100 feet east of the mid-line of the channel, the RIO-ORINOCO commenced to move to her left from the center line of the Mud Island Range with her engines still operating on "half ahead" (6 knots over-the-ground) and steadied her course in the westerly half of the channel.

27. At 5:28 P.M. (1728) the engine room executed an order reducing the ship's engines to "slow ahead" (3 knots over-the-ground) and the vessel prepared to pass the dredge.

28. Pilot Rutherford had become aware of the increased pressure on the starboard quarter of his vessel, requiring more left rudder, which was an effect of bank suction and sheer due to the vessel's proximity to the bank beyond the channel's western limit. The bow of the vessel commenced to fall off to starboard and headed toward the bow of the ATLAS.

Pilot Rutherford then ordered an increase in left rudder from 20° to 30° and an increase in engine speed to "half ahead", which was executed by the engine room at 5:29 P.M. (1729). This action reduced the starboard swing of the vessel somewhat, but not enough.

Almost simultaneously, an emergency five-blast whistle was sounded by the RIO-ORINOCO and an order for "full speed ahead" was issued, but the impact of collision was felt in her engine room nearly 30 seconds before the emergency "full speed ahead" order was fully executed. The emergency action was too late to prevent the collision in which the RIO-ORINOCO cleared the ATLAS bow, but scraped her starboard forward corner.

29. The refusal of the Atlas to move in response to the radio request of the RIO-ORINOCO about 30 minutes before the collision should have caused the pilot to consider the probable necessity of additional precautions, in view of *his opinion, at that time,* that the dredge was over the center line of the channel, despite the assurance of the ATLAS that plenty of open channel room was available.

30. Although Pilot Rutherford was of the *later opinion* that the position of the *sweep* presented a complicating factor in his navigation past the flotilla, he failed nonetheless to reduce the speed of his vessel in sufficient time or to call for the assistance of the escorting tugs, when he was yet in a position to obtain their aid, at least 1 mile and 20 minutes below the dredge flotilla.

31. A timely reduction in the speed of the RIO-ORINOCO or a timely employment of tug assistance would have lessened materially the effects of bank suction.

32. It was not prudent for Pilot Rutherford to assume that the reply of the ATLAS to the radio request of RIO-ORINOCO was an *unequivocal* clearance to pass the dredge, if his own observation had given him the contrary impression of inadequate clearance.

33. The sole proximate cause of the collision was the pilot's failure to order a timely reduction, before 5:27 P.M. (1727) in the speed of the RIO-ORINOCO, at least to "slow speed ahead", in consideration of the size, weight, draft and mobility of his vessel, his knowledge of the proximity of the bank to the west of

the channel, of the probabilities of bank suction and ensuing starboard sheer, of the presence of the dredge and of the normal lapse of time between issuance to and execution by the engine room of orders for changes in speed.

## DISCUSSION

 From the plethora of evidence which encumbers the record of this case, one salient fact emerges absolutely clear, *that a moving vessel struck a vessel at rest.* When a dredging machine is lawfully engaged in improving navigation and is struck by a moving vessel, the dredging machine is entitled to the rights of a vessel at anchor, not the least of which is, that such a collision raises a presumption of negligence on the part of the vessel in motion. American Dredging Co. v. The Bedowin, 1 Fed.Cas. page 643, No. 299 (D.N.J.1879); 26 Leg.Int. 52. A vessel in motion is required to avoid a vessel at anchor, if the latter is without fault, and the moving vessel is required to exonerate herself from blame, *"by showing that it was not in her power to prevent the collision by adopting any practicable precautions."* (emphasis supplied). The Virginia Ehrman, 97 U.S. 309, 315, 24 L.Ed. 890 (1878).

 The credible evidence established that the ATLAS and the sweep were at all times completely to the east of the western half of the Mud Island Channel. They were lawfully engaged in the performance of work required under their contract with the U.S. Army Corps of Engineers. The sweep left *unobstructed* 250 feet and the ATLAS 200 feet of the 300 feet width of the channel. Even though they obstructed a part of the *eastern* half of the channel they were not thereby rendered outlaws for purposes of a civil suit; and other vessels were required to exercise care for their safety. Utility Service Corp. v. Hillman Transportation Co., 244 F.2d 121, 124 (3 Cir. 1957). A dredge lawfully engaged in digging will be regarded as free from fault if there is ample free water for passage. The Freeport, 99 F.2d 842, 843 (4 Cir. 1938).

Before starting his voyage upriver, Pilot Rutherford knew from the notice issued by the Corps of Army Engineers that the western half of the channel would be open for navigation past the dredge ATLAS. He had similarly passed the ATLAS on many earlier occasions at or near the same location without incident.

With clear weather and excellent visibility the pilot had an unobstructed view of the flotilla for at least 2 miles from his place on the bridge 85 feet above the water. On other occasions he had navigated his ship past the ATLAS at the slowest possible speed without difficulty. However, on this day there was no reduction in speed from "half ahead" until 5:28 P.M. (1728), less than 2 minutes before collision with the dredge. It is argued by respondents that it would have been imprudent to reduce the speed of the RIO-ORINOCO because it was then in the throes of an *unexpectedly* severe sheer. We are not persuaded by this argument, since there was ample space and time to effect a reduction of the engine speed of the RIO-ORINOCO before the vessel was placed in a position of peril, which the pilot should have reasonably anticipated from his knowledge of and experience with natural conditions in the river in this area.

When the pilot was 2 miles below the ATLAS he erroneously thought that the dredge was over the center line of the channel. As the result of this mistaken observation he then requested the dredge to move. However, from a closer vantage point of one mile, he concluded that the ATLAS was about 50 feet east of the center line of the channel giving him 200 feet of clear channel room for his passage. He testified that he also observed at this point that the sweep appeared to him to be athwart the center line of the channel and was being attended by a tug and that he believed that the sweep presented a complicating factor to his passage by the ATLAS. If this were true, the pilot alerted by his own impressions, which were contrary to the radio reply from the ATLAS that there was plenty

of room to pass, either failed to foresee the possibility that the sweep would not move, or, foreseeing such possibility, failed to initiate "practicable precautions" to guard against such a contingency.

■ He could readily have called for the assistance of the escorting tugs to counteract the anticipated bank suction while he was 20 minutes away from the scene of the collision. An experienced river pilot is presumed to know the prevailing channel conditions and is expected to be prepared for an *emergency situation* such as a severe degree of bank suction and resulting sheer which may confront him in the course of his duties. The Severance, 152 F.2d 916, 919, 920 (4 Cir. 1945); see American Dredging Co. v. The Bedowin, 1 Fed.Cas. at p. 644, No. 299 (D.N.J.1879).

That we have rejected the pilot's testimony that he observed the sweep athwart the mid-line of the channel is evident from our findings that the sweep was, at first, directly downstream from the ATLAS and 30 to 40 feet east of the center line of the channel and that at 5:15 P.M. (1715) the sweep had been moved to a point at least 100 feet east of the middle line.

By way of exoneration, respondents urge that the dredge caused the collision by its misleading use of the radio giving the vessel clearance past the dredge; the failure of the dredge to sound a danger signal; the failure of the sweep to move from the center line; the failure of the dredge to move farther east of the center line; the failure of the owners of the dredge to instruct and train its personnel in the use of whistle signals; the failure of the owners of the dredge properly to train and supervise the personnel of the dredge flotilla; and the unseaworthiness and mismanagement of the dredge flotilla which resulted from gross inattention and carelessness on the part of the owners and the superintendent.

We find no merit in any of these claims, since the pilot unequivocally stated that the only circumstance that differentiated this voyage from his prior

trips past the ATLAS was the presence of the sweep athwart the center line of the channel, and we have found as a fact, that the sweep was not in that position at any material time and that the sweep's actual position in no way interfered with the navigation of the RIO-ORINOCO.

■ Pilot Rutherford never expected that the ATLAS would respond to his whistle signals, and his navigation was not affected by the lack of such response. The crew on the dredge believed that there was sufficient room for the RIO-ORINOCO to pass, so there was no reason for the dredge to sound a danger signal, since they were unaware of the conditions which were causing the RIO-ORINOCO to fall off to starboard in a sheer. In such a situation a failure to respond to signals or sound a warning blast was not a cause of the collision to which the Pennsylvania [1] rule might apply. A/S Skaugaas v. T/T P. W. Thistle, 227 F.Supp. 281, 293, 294 (D.Md.1964) aff'd. 345 F.2d 275 (4 Cir. 1965).

We have concluded that the sweep and the dredge were located at sufficient distances from the mid-line of the channel to provide the RIO-ORINOCO with substantially *more* than half the channel indicated to be available by the notice from the United States Corps of Army Engineers. Pilot Rutherford estimated that he had about 200 feet in which to pass the dredge, but the proctor for his vessel, at the trial, sought to establish that the distance was only 159 feet. While the exact distance was a matter of sharp disagreement, the pilot navigated his vessel under the belief, which we have found correct, that 200 feet of channel was available to pass the dredge, and if his calculation was incorrect, then his resulting navigation was clearly negligent.

He had a clear, unobstructed view of the channel, and as an expert pilot with a trained eye, was bound to exercise prudent judgment regarding distances, and is accountable for a failure so to do.

■ Any lack of training or of effective supervision of the dredge personnel or any mismanagement by the owners and superintendent of the dredge were merely *conditions* that existed at the time and were not *causes* of the collision. P. Dougherty Co. v. United States, 207 F.2d 626, 630–632 (3 Cir. 1953); cert. denied 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1068 (1954).

■ We therefore conclude, that the only *cause* of this collision was imprudence of the pilot in the navigation of the RIO-ORINOCO. The Perseverance, 63 F.2d 788, 790 (2 Cir. 1933).

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and of the subject-matter.

2. A moving vessel is presumed to be negligent when it strikes a dredge lawfully anchored in a navigable channel.

3. The S. S. RIO-ORINOCO has failed to rebut the presumption of negligence.

4. Neither the position of nor any of the conditions existing aboard the dredge ATLAS caused or contributed to the cause of this collision.

5. Neither the position of the sweep nor any of the conditions aboard the sweep caused or contributed to the cause of this collision.

6. The sole proximate cause of this collision was negligence in the navigation of the S. S. RIO-ORINOCO.

7. The S. S. RIO-ORINOCO is solely responsible for the collision with the dredge ATLAS on June 23, 1960.

---

1. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873) A doctrine of presumed liability has evolved from this case which requires an offender to show that one or more of its statutory faults could not have caused the collision when it appears that such fault(s) *had something to do with causing the collision.*