**CLIFFS–NEDDRILL TURNKEY INTERNATIONAL–ORANJESTAD, NEDDRILL 2 B.V. and Neddrill (Nederland) B.V., Plaintiffs,**

v.

**M/T RICH DUKE, her engines, tackle, apparel, etc., in rem, Rich Ocean Tankers S.A. and Fuyo Kaiun Co. Ltd. in personam, Defendants.**

Civ. A. No. 90–051–JLL.

United States District Court, D. Delaware.

Feb. 19, 1991.

See also 734 F.Supp. 142.

Peter M. Sieglaff and Stephen C. Norman of Potter, Anderson & Corroon, Wilmington, Del., James J. Sentner, Jr., of Haight, Gardner, Poor & Havens, and David E. Black of Griggs & Harrison, Houston, Tex., of counsel, for plaintiffs.

Wayne J. Carey of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., Joseph C. Smith of Burlington, Underwood & Lord, New York City, of counsel, for defendants.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

This admiralty suit arises from an allision [1] which occurred in the early morning

---

**1.** "The running of one vessel into or against another, as distinguished from a collision, i.e.,

hours of January 21, 1990, when the tanker RICH DUKE struck the drillship NEDD-RILL 2, which was anchored and engaged in drilling operations off the coast of Aruba. The Court has jurisdiction pursuant to 28 U.S.C. § 1333.

Plaintiffs, the owner, time charterer, and operator of the NEDDRILL 2 have moved for summary judgment on liability, claiming that the RICH DUKE was solely responsible for the allision. The defendants, the RICH DUKE, its owner, and manager, maintain that summary judgment is inappropriate because genuine issues of material fact exist as to the relative fault of each vessel. The Court, having reviewed the parties' briefs and heard oral argument, will grant plaintiffs' motion for summary judgment on the issue of liability for the reasons stated below.

## FACTUAL BACKGROUND

On January 21, 1990, the self-propelled drilling ship D/S NEDDRILL 2 ("NEDD-RILL 2") was anchored off the west coast of Aruba at a 090° heading over the MERO IX hole in 75 meters of water. *See* Affidavit of Pieter Kinkel, Docket Item ["D.I."] 45A, Ex. D at ¶ 3. The NEDDRILL 2 had been at this position, approximately 12–29.5 N, 70–13.8 W, since December 17, 1989, her captain having informed the harbor master in Aruba on December 15, 1989, that he intended to drill at that location. *See id.* at ¶ 4; Deposition of Pieter Kinkel, D.I. 76 at 31–32. The Inspector of Shipping for the Netherlands Antilles published the NEDD-RILL 2's position in its January 13, 1990 *Berichten aan Zeevarenden* ("Notices to Mariners"). *See* D.I. 45A, Ex. D at ¶ 4. The NEDDRILL 2 never notified any other agency of its location. *See* D.I. 76 at 35–36.

The NEDDRILL 2 is approximately 165 meters (180 yards) long and 27 meters (29 yards) wide, with a gross registered tonnage of 13,490 tons. *See* Register of Ships, D.I. 57, Ex. A. According to the NEDD-RILL 2's master, in the early morning hours of January 21, 1990, the vessel exhibited anchor lights, the night signal for a

vessel restricted in her ability to maneuver, and over 100 working floodlights of 500 and 1000 watts on the deck and rig tower. *See* D.I. 45A, Ex. D at ¶ 5; D.I. 76 at 21, 56–59. The vessel was secured by eight anchors, four on each side. *See* D.I. 45A, Ex. D at ¶ 3. One crewmember, Jan Goldschmitz, was on night watch on the bridge. *See* Deposition of Jan Goldschmitz, D.I. 77 at 12–13. As was customary aboard the NEDDRILL 2 under the circumstances, Mr. Goldschmitz did not maintain a constant lookout but tended to other matters during his watch. *See id.* at 9, 11, 15, 17; D.I. 76 at 12–14, 18–20. The NEDD-RILL 2's radar was off because visibility was good, *see* D.I. 77 at 30, approximately six to seven miles. *See* Deposition of Sunpyeong Pyeon, D.I. 71 at 2–87.

On the evening of January 20, 1990, the M/T RICH DUKE ("RICH DUKE") departed Puerto Miranda, Venezuela en route to Delaware City, Delaware with a full cargo, 560,000 barrels, of crude oil. *See* Deposition of Kwang Hwan Wi, D.I. 69 at 53. The RICH DUKE is approximately 244 meters (267 yards) long and 40 meters (37 yards) wide, with a gross registered tonnage of 50,285 tons. *See* Register of Ships, D.I. 57, Ex. B. From 0000 hours to 0350 hours on the morning of January 21, 1990, the RICH DUKE was under the command of second officer Kwang Hwan Wi. *See* D.I. 69 at 48–50, 82. Mr. Wi was accompanied on the bridge by quartermaster Byung Yong Yu, who served as helmsman while Mr. Wi acted as lookout. *See id.* at 54. There was no forward lookout. *See id.* at 50.

The RICH DUKE was traveling on automatic pilot at a speed of approximately fourteen knots on a 018° heading when its radar detected the NEDDRILL 2 around eleven miles to the north. *See id.* at 62, 67–68, 83–84. Earlier, Mr. Wi had turned off the Automatic Radar Plotting Aid ("ARPA") due to the proximity of several fishing vessels. *See id.* at 55–57, 61. Based on his radar readings, Mr. Wi determined that the NEDDRILL 2 was not mov-

the running of two vessels against each other." Black's Law Dictionary 69 (5th ed. 1979).

ing. *See id.* at 68–69. Mr. Wi saw the NEDDRILL 2's lights when it was approximately seven miles away. *See id.* at 68–71. At 0335 hours, Mr. Wi determined that the NEDDRILL 2 was still stationary, and that on its 018° course the RICH DUKE would pass the NEDDRILL 2 at an unsafe distance of about one mile. *See id.* at 69, 71–72, 78–79, 81. In order to safely pass at a distance of approximately three miles, Mr. Wi changed course to 025°. *See id.* at 71–72, 79.[2]

Second officer Sun-pyeong Pyeon relieved Mr. Wi at 0350 hours. *See* D.I. 71 at 2–12, 2–15; D.I. 69 at 76. Just prior to being relieved by Mr. Pyeon, Mr. Wi had determined that the NEDDRILL 2 was a drilling rig because of the brightness of the light aboard her. *See* D.I. 69 at 75. Mr. Wi advised Mr. Pyeon of the RICH DUKE's course and of the existence of the "oil rig" about four miles off the RICH DUKE's port bow. *See id.* at 76, 81; D.I. 71 at 2–37 to 2–38. At the same time, quartermaster Moon Hwan Chung relieved quartermaster Yu. *See* Deposition of Moon Hwan Chung, D.I. 70 at 14. Mr. Yu informed Mr. Chung of the presence of the oil rig. *See id.* at 14, 17.

Mr. Pyeon observed the oil rig through binoculars and initially thought it was stationary. *See* D.I. 71 at 2–22. As he continued to watch it through binoculars, he perceived movement, and changed the RICH DUKE's course from 025° to 035°. *See* D.I. 71 at 2–37 to 2–38, 2–60. At the time of the course change, the RICH DUKE was still traveling at fourteen knots, and Mr. Pyeon estimated that the NEDDRILL 2 was two to three miles away "because the lights was [sic] very, very bright." *See id.* at 2–39. Mr. Pyeon thought the NEDDRILL 2 was being pushed by a tug, although he never saw a tug, nor did he see red and green running or side lights indicating the NEDDRILL 2 was underway; he simply saw many bright lights. *See id.* at 2–43 to 2–48, 2–60 to 2–63. Mr. Pyeon thought the course change would allow the RICH DUKE to pass the oil rig at a dis-

tance of two to three miles. *See id.* at 2–40.

Mr. Pyeon did not use radar to track the NEDDRILL 2 or calculate its speed but simply relied on his visual observations through binoculars. *See id.* at 2–60, 2–64 to 2–65, 2–68. Mr. Pyeon had activated the ARPA at the beginning of his watch, and immediately after he altered course from 025° to 035°, the ARPA alarm had warned Mr. Pyeon of the potential danger of collision with the NEDDRILL 2. *See id.* at 2–16, 2–65; D.I. 70 at 19, 24–26. Mr. Pyeon turned off the alarm because he recognized the danger. *See* D.I. 71 at 2–66 to 2–67. Then he went to the window and said to Mr. Chung, "We are in trouble." *See* D.I. 70 at 25, 27–29.

It was shortly after 0400 hours when Mr. Pyeon determined that a collision between the RICH DUKE, still traveling on autopilot at fourteen knots with her course at 035°, and the NEDDRILL 2, approximately 400 meters (437 yards) away, was imminent. *See* D.I. 71 at 2–69, 2–80. Mr. Pyeon ordered Mr. Chung to turn "hard to starboard by manual." *See id.* at 2–75 to 2–76; D.I. 70 at 25, 29. The port quarter of the RICH DUKE struck the starboard bow of the NEDDRILL 2. *See* D.I. 71 at 2–81. Before the accident, Mr. Pyeon never attempted to contact the NEDDRILL 2 by radio, nor sound the RICH DUKE's horn, nor slow the RICH DUKE. *See id.* at 2–68 to 2–69, 2–84.

On the NEDDRILL 2, Mr. Goldschmitz, having scanned the bridge sometime between 0345 and 0400, was in the "DP room" off the bridge when the RICH DUKE hit. *See* D.I. 77 at 12–13, 30. Just before the accident others aboard the NEDDRILL 2 saw a vessel approaching but by the time they realized that the RICH DUKE was indeed heading into the NEDDRILL 2, the allision occurred. *See* Affidavit of Sean Wood, D.I. 57, Ex. I; Deposition of Faris Whitley, D.I. 75 at 30–31.

---

**2.** Mr. Wi did not take into account the existence of a 1.4° westerly error in the gyroscope at the time he changed course, nor had he advised the ship's master of the existence of the calibration error in the gyroscope. *See* D.I. 69 at 79–80; Deposition of Anhong Gim, D.I. 72 at 52.

## DISCUSSION

Summary judgment will be entered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. Defendant RICH DUKE maintains that summary judgment is inappropriate because factual issues remain regarding the NEDDRILL 2's responsibility for the allision. According to both parties' briefs, the only disputed fact is whether or not the NEDDRILL 2 displayed lights indicating that she was anchored and restricted in her ability to maneuver as required by the "International Rules of the Road." *See* Convention on the International Regulations for Preventing Collisions at Sea in 6 Benedict on Admiralty Doc. No. 3–4 (7th ed.) (hereinafter referred to as the "Rules of the Road").[3] However, the depositions submitted in support of the briefs reveal no dispute regarding the fact that the required lights were on; the testimony simply suggests that the "restricted ability to maneuver" lights were masked by the numerous working floodlights aboard the NEDDRILL 2. Neither party otherwise disputes the other's description of the circumstances preceding the accident; the parties merely disagree as to the legal significance of the undisputed facts. As explained *infra*, the Court concludes that summary judgment in plaintiffs' favor is appropriate because, even assuming that

the NEDDRILL 2's "restricted ability to maneuver" lights were obscured by the working lights, the overwhelming evidence of the RICH DUKE's negligence compels a determination that it was solely responsible for the allision.

### A. The Presumption of Fault Against a Moving Vessel Which Hits a Stationary Vessel

■ Although in a typical negligence action the plaintiff bears the burden of proving the defendant's fault, plaintiff here seeks to shift to defendant the burden of producing evidence exonerating itself from liability by invoking the presumption of fault which arises when a moving vessel hits a stationary one. *See The Oregon,* 158 U.S. 186, 192, 15 S.Ct. 804, 806, 39 L.Ed. 943 (1895); *The Virginia Ehrman,* 97 U.S. 309, 315, 24 L.Ed. 890 (1878).[4] However, the presumption takes effect only upon a showing that the stationary vessel was properly anchored and lit. *See The Oregon,* 158 U.S. at 192, 15 S.Ct. at 806; *The Virginia Ehrman,* 97 U.S. at 315; *Al Johnson Constr. Co. v. S.S. Rio Orinoco,* 249 F.Supp. 182, 186 (E.D.Pa.1965).

Defendant RICH DUKE contends that plaintiff NEDDRILL 2 may not rely on the presumption of fault because the NEDDRILL 2 did not display the lights required by the Rules of the Road indicating a ship restricted in her ability to maneuver[5] or displayed them in such a way that they were obscured by the working lights on

---

**3.** The United States became a signatory to the Convention in 1977; the Rules can be found at 33 U.S.C. foll. § 1602.

**4.** Although for purposes of its earlier *forum non conveniens* opinion only the Court determined that Aruban law governs this case, *see Cliffs–Neddrill Turnkey International–Oranjestad v. M/T Rich Duke,* 734 F.Supp. 142, 149 (D.Del. 1990), the parties' briefs on summary judgment omit any discussion of choice of law. While the Rules of the Road apply regardless of whether the allision occurred in Aruban territorial waters or on the high seas, *see* 6 Benedict on Admiralty Doc. No. 3–4 at 3–76 n. 6 (indicating that Aruba adopted the Rules in 1986), it is not entirely clear that the various presumptions upon which the federal courts rely in admiralty cases would apply if Aruban law did in fact

govern this case. *See, e.g., Ishizaki Kisen Co. v. United States,* 510 F.2d 875 (9th Cir.1975). However, because the parties have neither raised the choice of law issue nor presented any authority about foreign law, the Court concludes, for purposes of this opinion only, that the parties have acquiesced in application of the law of the forum with respect to presumptions of liability. *See Interpool Ltd. v. Char Yigh Marine (Panama) S.A.,* 890 F.2d 1453, 1458 (9th Cir.1989), *amended,* 918 F.2d 1476 (9th Cir. 1990).

**5.** "A vessel restricted in her ability to manoeuvre ... shall exhibit ... [t]hree all-round lights in a vertical line where they can best be seen. The highest and lowest of these lights shall be red and the middle light shall be white...." Rule of the Road 27(b).

deck.[6] *See Valencia v. Skou,* 1977 A.M.C. 1232, 1237 (N.D.Cal.1977) (presumption of fault could not be invoked upon failure to prove that stationary vessel was properly lighted). The NEDDRILL 2's master testified upon deposition that the ship displayed the required lights. *See* D.I. 76 at 21, 56–59. The testimony of Mr. Pyeon, in command of the RICH DUKE at the time of the accident, that he did not see the lights, *see* D.I. 71 at 2–62 to 2–63, does not contradict the NEDDRILL 2's position that the lights were on, but does support the RICH DUKE's contention that the required lights may have been masked by the multitude of high-power working lights on the NEDDRILL 2.

 However, even if the Court assumes that defendant RICH DUKE is correct in its contention that the required lights were obscured,[7] and thus concludes that plaintiff is not entitled to invoke the presumption of fault, there is sufficient record evidence of the RICH DUKE's negligence to permit the Court to find the RICH DUKE solely responsible for the allision in the absence of the presumption of fault. *Cf. Pennsylvania R.R. Co. v. S.S. Marie Leonhardt,* 320 F.2d 262, 264 (3d Cir.1963) (presumption of fault against moving vessel which hits stationary object disappears when both sides present evidence of their version of accident); *Peoples Natural Gas Co. v. Ashland Oil, Inc.,* 604 F.Supp. 1517, 1524–25 (W.D.Pa.1985) (same). Specifically, the RICH DUKE's crew was negligent in the following respects: (1) failing to make proper use of radar to ascertain whether or not the "oil rig" was moving and to determine whether the vessels were on a collision course (Rule 7(b)); (2) failing to slow down to avoid the allision or to allow more time to assess the situation (Rule 8(e)); (3) failing to give a warning signal when the RICH DUKE was uncertain of the NEDDRILL 2's intentions (Rule 34(d)); (4) failing to make radio contact with the NEDDRILL 2 to alleviate any doubts as to the vessel's identity and perceived movement. *See In re Complaint of Potomac Transport, Inc.,* 741 F.Supp. 395, 407 (S.D.N.Y.1989), *aff'd in pertinent part,* 909 F.2d 42 (2d Cir.1990) ("A prudent, cautious navigator would certainly have sought to communicate with a vessel approaching in a crossing situation."); *see also* Deposition of Anhong Gim (RICH DUKE's master), D.I. 80 at 137 (Gim would attempt to communicate with a vessel if its intentions were unclear.)

### B. The Pennsylvania Rule

The RICH DUKE next argues that despite its above-enumerated faults, the rule of *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), prevents the Court from holding the RICH DUKE wholly responsible for the allision. In *The Pennsylvania,* the Supreme Court held that a vessel shown to have violated a regulation intended to avoid collisions has the burden of proving that its violation could not have caused the accident. *See id.* 86 U.S. at 136. The RICH DUKE contends that the NEDDRILL 2's failure to display the "restricted ability to maneuver" lights so that they were distinguishable from the other lights constitutes a violation of Rule of the Road 20(b),[8] and, thus, the NEDDRILL 2 bears the burden of proving that its violation could not have caused the allision. The plaintiff NEDDRILL 2 does not dispute the applicability of the *Pennsylvania* Rule but maintains that its alleged failure to display the "restricted ability to maneuver" lights so they were distinguishable from the working floodlights could not have caused the accident, because the NEDDRILL 2 was otherwise well illuminated and the RICH DUKE's crew saw no

---

**6.** "The Rules concerning lights shall be complied with from sunset to sunrise, and during such times no other lights shall be exhibited, except such lights as cannot be mistaken for the lights specified in these Rules or do not impair their visibility or distinctive character, or interfere with the keeping of a proper look-out." Rule of the Road 20(b).

**7.** In considering a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *See Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir. 1989).

**8.** *See supra* note 6.

running lights indicating the NEDDRILL 2 was underway. *See* Reply Brief, D.I. 62 at 3; D.I. 71 at 2–61.

■ The Court agrees that the NEDD-RILL 2 bears the burden of proving that its violation of Rule of the Road 20(b) could not have caused the accident, but also finds that the NEDDRILL 2 has met its burden under the Pennsylvania Rule.

"The Pennsylvania ... did not intend to establish a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable, or remote."

*Board of Comm'rs v. M/V FARMSUM*, 574 F.2d 289, 297 (5th Cir.1978) (quoting *Compania de Maderas de Caibarien v. The Queenston Heights*, 220 F.2d 120, 122 (5th Cir.), *cert. denied sub nom., Esso Shipping Co. v. Compania de Maderas de Caibarien*, 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736 (1955)). Rather, "fault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract." *Id.*

■ The Court finds that the NEDD-RILL 2's inadequate display of "restricted ability to maneuver" lights "could not reasonably be held to have been a proximate cause of the [a]llision." *Pacific Tow Boat Co. v. States Marine Corp.*, 276 F.2d 745, 749 (9th Cir.1960). The NEDDRILL 2 was saturated with light, as the RICH DUKE's crew observed from a distance of seven miles. *See* D.I. 69 at 68–71. While second officer Pyeon was under the impression that the NEDDRILL 2 was underway, *see* D.I. 71 at 2–64, he saw no running lights, nor did he otherwise confirm his visual observations despite having ample time and sophisticated equipment to do so. *See id.* at 2–43 to 2–48, 2–60 to 2–65. As the Third Circuit stated in *Diamond State Tel. Co. v. Atlantic Refining Co.*, 205 F.2d 402, 409 (3d Cir.1953), "[F]ailure to carry the proper lights will not render a vessel at fault when she was in fact seen by the other in time to avoid the collision and the other thereafter fails to take proper avoiding action." *See also P. Dougherty Co. v. United States*, 168 F.2d 464, 466 (2d Cir.1948) ("Some failure to maintain fully the prescribed lights was borne out by the findings [but] [t]he court found that she was brilliantly lighted, could be seen a long distance away, and that her running lights and range lights were not lighted.... [T]here was nothing to justify any belief on the part of the [RICH DUKE] that the [NEDDRILL 2] was moving....").[9]

■ The RICH DUKE also invokes the Pennsylvania Rule with respect to the NEDDRILL 2's alleged failure to keep a proper lookout, a violation of Rule of the Road 5. In order to find a violation of Rule 5, the Court must conclude that the NEDD-RILL 2's failure to maintain a constant

---

**9.** The three cases defendant's brief cites in support of the RICH DUKE's position that the NEDDRILL 2 cannot escape liability for the accident due to its improperly displayed lights are inapposite. In *The William C. Atwater*, 110 F.2d 644 (2d Cir.1940), a tug struck a vessel anchored in a narrow channel. Although the Second Circuit noted that the anchored vessel's lights caused some confusion on the part of those aboard the tug as to whether the vessel was stationary or moving, the Second Circuit expressly faulted the anchored vessel for obstructing a navigable channel, not for its improperly displayed lights. *See id.* at 646.

In *The Chester O. Swain*, 76 F.2d 890 (2d Cir.1935), an anchored vessel which rigged makeshift lights after a fire damaged her regular anchor lights failed to carry her burden under the *Pennsylvania* Rule to show that her lack of regulation lighting could not have caused the accident. The court reasoned that had she displayed the proper lights, she may have been seen sooner by the oncoming vessel, allowing it more time to avert the accident. *See id.* at 892. The RICH DUKE cannot claim that it did not see the NEDDRILL 2 in time to avoid the allision.

Finally, in *Ocean S.S. Co. v. United States*, 38 F.2d 782 (2d Cir.1930), a ship collided with a submarine, due in part to the fact that the bright white masthead light on the submarine obscured its red running light, leading the crew of the ship to believe it was overtaking another vessel when, in fact, they were in a crossing situation. However, as noted in the text, in a more recent case the Second Circuit did not consider failure to maintain required lights a contributing cause of an allision under circumstances more closely analogous to the present case. *See P. Dougherty Co. v. United States*, 168 F.2d 464, 466 (2d Cir.1948).

lookout was negligent under the circumstances. *See Inland Oil & Transport Co. v. Ark–White Towing Co.*, 696 F.2d 321, 325 (5th Cir.1983). Given the conditions prevailing at the time of the accident and the NEDDRILL 2's radiance, the Court finds it was not unreasonable for the NEDDRILL 2 to dispense with a constant lookout. *Cf. Darling v. Scheimer*, 444 F.2d 514, 515 (9th Cir.1971) (no duty to maintain constant watch on "fully lit vessel, dead in the water on the high seas in flat calm weather, with good visibility on a clear, moonlit, fog-free night").

## C. The NEDDRILL 2's Publication of Its Location to Authorities

Finally, the RICH DUKE maintains that the NEDDRILL 2's failure to report its location to the Defense Mapping Agency ("DMA") constitutes negligence.[10] The DMA, part of the United States Department of Defense, provides nautical charts and marine navigation data for the use of navigators worldwide. *See* Deposition of Mitchell Kalloch, D.I. 87 at 12 & Ex. 2. The DMA publishes weekly Notices to Mariners advising vessels of important matters affecting navigational safety and also disseminates navigational warnings via daily broadcasts. *See id.* at 14–17. Information regarding drillship movements is supplied to the DMA from a variety of sources on a voluntary basis. *See id.* at 36–37.

■ DMA records contain "rig movement reports," issued by the DMA on a weekly basis, three of which relate to the NEDDRILL 2's movements before and after the accident, but none of which report the NEDDRILL 2's position over the Mero IX hole from December 17, 1989 until the date of the accident. *See id.* at Ex. 6. The NEDDRILL 2 did report its location to the Aruban harbor master on December 15, 1989, and it was published in the Nether-

lands Antilles' Notices to Mariners on January 13, 1990. *See* D.I. 76 at 31–32; D.I. 45A, Ex. D at ¶ 4. The record contains no testimony explaining how the DMA acquired the information contained in the three rig movement reports, nor any evidence of the custom or practice drillships observe with respect to publishing their locations. In the absence of any showing that the NEDDRILL 2 breached customary standards of good seamanship, the Court cannot conclude that the NEDDRILL 2's notification of Aruban authorities was inadequate.[11]

At oral argument, defendant's attorney cited *Arabian American Oil Co. v. Hellenic Lines, Ltd.*, 633 F.Supp. 659 (S.D.N.Y. 1986) *("ARAMCO")*, as authority for its position that the NEDDRILL 2's failure to report its location to the DMA constitutes negligence. However, the *ARAMCO* case differs significantly from the case at bar. In *ARAMCO*, a cargo vessel struck an unmanned oil well platform in the Persian Gulf at night. The platform was not equipped with an audible sound signal, and the lights on the platform were not functioning because the batteries were dead. *See id.* at 661. The platform's location had not been reported to any authorities. *See id.* at 660–61. The crew of the cargo vessel did not detect the platform, either visually or by radar, until the vessel struck it. *See id.* at 662. The court placed one third of the blame for the allision on the owners of the oil platform due to its lack of lighting and sound signals and their failure to publish its location. *See id.* at 669–70.

■ The RICH DUKE, unlike the cargo vessel in *ARAMCO*, detected the NEDDRILL 2's presence by radar at eleven miles and visually at seven miles, with ample opportunity to ascertain what it was and whether it was moving or stationary. The RICH DUKE's crew had the means to dis-

10. The RICH DUKE also faults the NEDDRILL 2 for not reporting its position to the British Admiralty's Hydrographer of the Navy, another agency which publishes Notices to Mariners in the English language. *See* D.I. 57 at ¶ 4.

11. The record is also devoid of any evidence of the practice aboard the RICH DUKE as to which

Notices to Mariners she received and the manner in which the crew was apprised of the information contained therein. Thus, the Court cannot assume that had the NEDDRILL 2 directly notified the DMA or British authorities of its location, that the RICH DUKE's crew would have assimilated that information.

cover any information regarding the NEDDRILL 2 which they needed to avoid the allision but chose not to avail themselves of those means. Even were the NEDDRILL 2 remiss in failing to report its location to the DMA, such failure cannot possibly be considered a proximate cause of the allision.

## CONCLUSION

The Court finds that the defendant RICH DUKE was solely responsible for striking the NEDDRILL 2 on January 21, 1990. An order will issue granting plaintiff's motion for summary judgment on the issue of liability.