The ARABIAN AMERICAN OIL
COMPANY, Plaintiff,

v.

HELLENIC LINES, LTD., in personam and HELLENIC NAVIGATOR, her engines, boilers, tackle, etc. in rem, Defendants.

No. 83 Civ. 1507(MP).

United States District Court,
S.D. New York.

April 28, 1986.

Richard G. Ashworth, James J. Shirley, Jr., Haight, Gardner, Poor & Havens, New York City, for plaintiff.

Robert B. Pohl, John G. Ingram, W. Thaddeus Miller, Burlingham Underwood & Lord, New York City, for defendants.

OPINION

MILTON POLLACK, Senior District Judge.

The Arabian American Oil Company ("Aramco") brings this admiralty negligence action, *in personam* against Hellenic Lines Ltd. ("Hellenic"), a Greek corporation that owns the Hellenic Navigator ("Hellenic Navigator"), a general cargo vessel, and *in rem* against Hellenic Navigator for damages from an allision on February 20, 1981, in the Persian Gulf in which the Hellenic Navigator, with a 30-man crew, collided with and extensively damaged Aramco's stationary, unmanned oil well platform. Hellenic has interposed counterclaims on a negligence theory for damage sustained by the vessel. The issues were presented to the Court at a Bench trial. The issues of liability and damages were bifurcated and only the former was tried.

Although extensive damages were occasioned to the vessel, and without knowing whether the platform which the ship had rammed was manned or unmanned, the ship proceeded on without stopping for several miles, until the damage to it from the allision prevented further travel; the ship had taken on so much water in its damaged forward starboard compartment that its bow was down substantially in the water, lifting the propeller in the rear of the vessel out of the water. Only then did the vessel stop and send out a distress call for help.

At the time and place of the allision winds were from the northwest at 4–8 knots, seas were moderate, visibility was good, there was no precipitation, and the sky was partly cloudy, the moon having been at full two days earlier. Radar, if used properly, was giving a good picture miles ahead. Additionally, far distant, there was a glow of light from oil fields that were flaring off natural gas.

I. *Background*

On January 16, 1981, installation was completed for plaintiff Aramco's unmanned, single well oil field tripod platform ("platform"), Zuluf Well 88, in the Persian Gulf. The platform is on the high seas, 41 miles from the Saudi Arabian coastline, at nautical position 28°25'39.1" North, 49°23'29.6" East. This location is about 2 miles east of the charted area of the Zuluf Oil Field, between the Zuluf Oil Field and the Marjan Oil Field.

The steel platform had dimensions of 44 feet × 32 feet, resting 33 feet above the water on three 36 inch diameter steel legs, joined by multiple steel cross braces. There is a steel "gin-pole" mast extending to a height of some 68 feet, nine inches above the water. The platform was painted a bright color, either an international orange or a yellow.

Until the date of the allision, February 20, 1981, the platform's existence had not been reported to any navigational warning authority nor was it shown on any navigation chart[1] nor reported in any Notice to

---

1. Even had the platform been charted properly, the Hellenic Navigator's crew did not have on board up-to-date navigation charts. The Hellenic Navigator was using a 1977 chart, updated with written Notices to Mariners to correct the chart up through the third week in December 1980; it had no 1981 updates on board at the time of the allision.

Mariners, either written or radio. Had its existence been reported to the Middle Eastern Navigation Aids Service ("MENAS"), and had MENAS followed its published procedures, navigation warnings would have been broadcast by MENAS 4 times daily.

At the time of the allision, 2320 hours (11:20 p.m.), the lights installed on the platform to warn merchant traffic of the platform's location were not functioning because the batteries were dead. Although instructed to do so, the platform's contractor had not installed sun switches on the platform's navigation lights, which would have conserved battery power during daylight hours. Without sun switches, the batteries could not have lasted until the date of the allision, February 20; Aramco knew at the time of the platform's installation, January 16, that sun switches were missing. Nor was the platform equipped with a device to produce an audible sound signal to approaching vessels.

These three deficiencies, *i.e.*, lack of night lighting, lack of an audible navigation sound horn, and lack of notification to navigational authorities of the platform's existence, form the basis for Hellenic's negligence claims against Aramco.[2] The remaining factual discussion therefore relates to the more complicated negligence claims of Aramco against Hellenic.

At 1045 hours (10:45 a.m.) on February 20, the Hellenic Navigator had departed Bahrain for Kuwait. At 2000 hours (8:00 p.m.) the watch was relieved by the 8–12 p.m. shift second officer; and shortly thereafter the master, Captain Nikas, came to the bridge. The master sent the second officer below to do some paperwork and took over the watch himself. The master remained on watch with an able seaman at the helm, steering manually, and another able seaman standing lookout, moving from one bridge wing to the other at regular intervals of ten to twenty minutes. These two seamen alternated their respective jobs hourly. No lookout was posted on the bow. The radar supposedly was operating on various ranges and the master supposedly was maintaining a radar watch.

Hellenic Navigator had a Kelvin Hughes radar, with antenna 99–106 feet above the water surface.[3] This radar was the unit originally installed on the vessel when it was built in 1972; it had range scales from ½ mile to 64 miles. Using Hellenic Navigator's radar, if functioning and monitored properly, the maximum electronic range at which there is a 100% probability (using a formula) of detecting an object of the platform's dimensions is about 13⅓ miles.

Before the allision, Hellenic Navigator's radar had been repaired on July 26 and August 8–9 in 1979, and again on March 15, 1980. After the allision, the radar was repaired on April 20, 1981 (two months after the allision), on January 5 and on April 5 in 1982.

At about 2231 hours (10:31 p.m.) on February 20, the Hellenic Navigator was on course 311°T which was intended to take her between the Marjan Oil field to starboard and Zuluf Oil Field to port through International waters. The route claimed to be the intended path is a recognized seaway lane for vessels because of the need to

On the Hellenic Navigator's voyage across the Atlantic to Suez, its Captain studied the *Persian Gulf Pilot.* At page 15 of the 1967 edition of the *Persian Gulf Pilot,* it states that "[v]essels [in the Persian Gulf] should, however, be on their guard against encountering [numerous oil rigs and drilling platforms] which may be uncharted and unlit." The supplements to the *Persian Gulf Pilot* in effect on February 20, 1981, warn that, because of submarine pipelines and oil rigs, "[m]ariners should navigate with caution [between the Zuluf and Marjan Oil Fields] and avoid anchoring in this area."

2. The parties agree, however, that on and prior to the date of the allision, February 20, there was no international treaty or convention or Saudi Arabian statute or regulation requiring that platforms like this one be fitted with navigational aid lights, be fitted with an audible sound signal device, or be reported to MENAS or to any other authority.

3. The distance between the antenna and the surface of the water has significance in radar ducting theory, a theory discussed *infra* p. 664.

remain out of the war zone declared by Iran in the Iran-Iraq war.

Because the Captain erased the route actually taken, as plotted on the ship's sailing record, we are left without information as to where the Captain thought the vessel was actually supposed to be sailing at the time. Entries in the logbook did not necessarily establish what in fact was the case.

At 2320 hours (11:20 p.m.) that evening, while on a heading of 311°T, and making a sea speed of about 14 knots, the Hellenic Navigator collided with Aramco's platform. The unlighted platform was not observed by either the Captain, the lookout, or the helmsman on the Hellenic Navigator—or so they said—either visually or by radar, prior to the allision. The Captain said that his first awareness of the platform was when he saw sparks on the starboard side of his vessel and then saw what he thought was a floating object as his ship passed by it.

The Captain of the Hellenic Navigator knew that the Persian Gulf contained numerous unlit and uncharted oil rigs and platforms. Indeed, this fact was widely known among those sailing in the Persian Gulf. Ordinary care therefore required added vigilance in this area to avoid these hazards, particularly when navigating near the charted oil fields themselves.

After the allision, the Hellenic Navigator's speed was reduced. Although he determined that the object the Hellenic Navigator hit was not a vessel but a structure, the Captain did not determine whether the structure was manned or unmanned. Despite not knowing whether any men were on the platform or in the water, and, if there were any, whether they were in imminent peril, Captain Nikas did not stop his vessel to investigate what had happened or who might be there or to provide possibly-needed life-saving assistance to anyone who was there.

After feeling the impact of the allision, the Hellenic Navigator's second officer came back to the bridge, looked in the radar and saw the platform's target. The second officer testified that about seven or eight minutes after the allision, the plat-form was about two miles away from the vessel. He further testified that the Captain then ordered him away from the radar.

Forty minutes after the allision, the Hellenic Navigator's engines were finally stopped. The only reason the vessel's engines were stopped at this point was that the ship *could not* move any further. Because of damage from the allision, a massive amount of water had entered the forward starboard compartment so as to force the ship's bow down substantially in the water, lifting the propeller in the rear of the vessel out of the water.

The impetus of the ship continued moving it ahead for another 20 minutes and then it was anchored. When anchored, the ship was approximately 7 miles north-northwesterly of the damaged platform.

The Hellenic Navigator was continuing to take on water in its No. 1 cargo hold. Captain Nikas, believing the ship to be in danger of sinking, sent out a distress call. He advised other vessels, *inaccurately*, that the Hellenic Navigator had collided with an unlit *floating* object in position 28°26.5′ N, 49°30′E. This reported position of the platform is eight miles from the Zuluf Oil Field, whereas the platform was actually only two miles from the edge of the oil field. Subsequent attempts by other ships to locate the platform's position by radar were misdirected for a time because of this misinformation, either incompetently ascertained or carelessly furnished or, perhaps, the vessel was unknowingly off course at the time by that number of miles.

A British tanker, M/T British Trident, and a Danish tanker, M/T Nicoline Maersk, responded to the distress call. At that time, both vessels were to the north and west of the Zuluf Oil Field. The British tanker arrived on the scene at 0048 hours (12:48 a.m.) on February 21, 28 minutes after the Hellenic anchored, and proceeded to circle, awaiting a possible rescue effort. In approaching the Hellenic Navigator, the master of the British tanker, with his vessel being so close to the oil field, immedi-

ately placed a lookout on the bow to enhance safety.

While circling, the British tanker used its radar, two Decca 10 centimeter radars with antennas 150–160 feet above the water surface, to attempt to locate what the Hellenic Navigator had struck in the location furnished by Captain Nikas. The master monitored one radar and the mate the other. Using radar for varying ranges up to 24 miles and at a full 360° spread, neither man detected what the Hellenic Navigator had struck, only about 7 miles distant. However, circling in the manner adopted, the British tanker could have produced a disorienting effect on radar detection. In addition, if the person monitoring the radar had suppressed sea clutter too much, small targets would be lost. Moreover, the British tanker initially was searching for a floating object as reported, and not the stationary platform, at the position incorrectly reported by Hellenic Navigator's Captain.

The Danish tanker arrived at 0502 hours (5:02 a.m.), but was not required to stand by since the situation did not require it.

The Danish tanker, in proceeding toward the Hellenic Navigator, used its radars, a 3 centimeter and a 10 centimeter, with antennas 95 feet above the water surface, monitored by its watch officer and its master, to attempt to locate what the Hellenic Navigator had struck, supposedly a floating object. Nothing was detected at first, despite use of the 6, 12 mile and other range scales. The Danish tanker was also searching for an unknown floating object, not the stationary platform, at the position incorrectly reported by the Hellenic Navigator's Captain.

After passing by the Hellenic Navigator, the Danish tanker continued to search using its radar. At 0515 hours (5:15 a.m.) on February 21, thirteen minutes after passing by the Hellenic Navigator, it detected the platform, at a distance of about 5 miles, on both its radars. At 3½–4 miles away from the platform, the watch officer, Mr. Green, sighted it visually with binoculars.

At a distance of 2–2½ miles, he could see it without binoculars because of light from flares in the nearby oil fields. Green calculated the platform's position as latitude 28°–25′.6N, longitude 49°–23′.8E. This information was passed to the other two ships and all three recorded it as the platform's position.

The British tanker then plotted the platform's position and attempted to find it by radar but was still unable to do so, despite knowing where the platform was located. Once again, the problems created by its circling movements and by suppressing sea clutter could have been having an effect on radar detection.

After it was determined that the Hellenic Navigator was not going to sink, the British tanker was released and it left at 0700 hours (7:00 a.m.) on February 21, travelling southeast toward the Marjan Oil Field buoy. At this time, the British tanker detected the platform by radar at a distance of 3–4 miles from it.

The Hellenic Navigator was able to rectify its immobility problem by flooding a rear storage compartment with water, thereby balancing the water flooding in the front portion of the vessel, and thus allowing its propeller to once again enter the water. The Hellenic Navigator then proceeded to Kuwait.

After the allision, and the heavy damage therefrom to his ship and the then unknown scope of damage inflicted on the object of the allision, when the ship made port, the Hellenic Navigator's master erased the vessel's navigation chart, which was the only reliable indication of the actual route that the vessel was supposed to be travelling. Although the given explanation was that it is common procedure, in preparing to begin the next voyage, to erase the old chart of the course being sailed after completion of a *safe* voyage, in these circumstances erasing the navigation chart was akin to destroying valuable evidence. An innocent and prudent master would not

have erased the vessel's navigation chart after sustaining a major accident.[4]

### A. Ducting Theory Explained

John Parry, Hellenic's expert, testified on the phenomenon of radar ducting, in which, because of certain atmospheric conditions, some targets may not be perceived by radar, even though a vigilant watch on the radar is being kept. If this phenomenon is present in the atmosphere, and a target therefore is not detectable, a "radar hole" exists.

Ducting occurs when there is a warm, dry air mass over a mass of cool, moist air. The transitional layer of air between these two masses (the "trapping layer") produces a trapping effect on radar radiation. This trapping occurs because of refraction, which is the bending of radar rays away from their normal straight line direction.

If the radar antenna and the target are both below in the trapping layer, the trapping layer does not adversely affect the radar's ability to detect a target and normally greatly increases the ability to detect the target at extended ranges.

If the radar antenna and the target are on different elevation sides of the trapping layer, however, the detection ability of the radar is reduced. This reduction in a radar's efficiency occurs because the radiation emitted by the radar either is mostly confined within the trapping layer or is refracted skyward, thus not striking the target. Even if some of the radiation from the radar penetrates the trapping layer to strike the target, the radiation reflected back from the target encounters the same phenomenon so that the radiation may not be received by the radar set.

Accepting the validity of the scientific theory, in the abstract, this Court finds that radar ducting, submitted as a speculation, was not established credibly as being present at the time and place of the allision and thus did not interfere with the Hellenic Navigator's ability to detect the platform. The Hellenic Navigator's radar had admittedly detected a lighthouse at 12.2 miles distance about three hours before the allision and had detected the Marjan Oil Field buoy, a target smaller than the platform, at 1.9 miles distance about 40 minutes before the allision. At the speed it was travelling, the Hellenic Navigator could have avoided hitting the platform had it alertly detected the platform at least one quarter mile from it.

### II. Discussion

■ By virtue of our admiralty jurisdiction, 28 U.S.C. § 1333(1) (1982), this Court has subject-matter jurisdiction over these negligence claims arising from an allision on the high seas in the Persian Gulf between defendant's cargo vessel, the Hellenic Navigator, and plaintiff's oil drilling platform. This controversy, therefore, is governed by federal maritime law. *Allied Chemical International Corp. v. Companhia De Navegacao Lloyd Brasileiro*, 775 F.2d 476, 481 (2d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986).

Hellenic's claims against Aramco, as noted previously, are grounded in general negligence principles based on the platform's three alleged deficiencies, *i.e.*, lack of light, sound, and notification to navigational authorities. Aramco's claims against Hellenic are more complicated. First, Aramco claims that Hellenic violated four specific statutory standards of care set out in International Regulations. Second, Aramco claims that a presumption of negligence

---

**4.** The destruction of the navigation chart of the passage through the Persian Gulf may have a bearing on why the Captain mislocated the scene of the accident by some six miles. It supports an inference that the Captain mistook the actual course he was sailing by that wide a margin and that the chart, if preserved, would have negated the story proffered of an intended shortcut taken intentionally through the oil field area; it gives credence to the assertion that the Hellenic Navigator was navigating off-course and too close to areas where unmarked and unlighted obstructions were to be found. Entries in the logbook identifying the course supposedly sailed were of course subject to the Captain's control. At all events, destruction of the evidence soon after a major accident warrants drawing adverse inferences and serious doubts of credibility.

arises when a moving vessel strikes a stationary object. Third, Aramco, by analogizing to the presumption of negligence arising under the Standby Act, 33 U.S.C. § 367 (1982),[5] when a vessel does not stop after an accident, claims that Hellenic's "hit-and-run" tactics create a presumption of negligence.

The evidence sufficiently establishes and the Court finds that both parties were at fault, although in different degrees, and that both parties' fault contributed to causing the allision; both therefore will be required to share the damages in proportions to be fixed.

Because this Court determines that the Hellenic Navigator is at fault based on the unacceptability of its explanations and its violations of International Regulations adopted as part of American law, Aramco's second and third grounds for finding Hellenic liable, as mentioned above, will not be addressed.

The Hellenic Navigator bears the major fault. The issues of credibility of the fact witnesses, who were on the scene at various times, all of whom testified by deposition, are decided in favor of the plaintiff and against the defendants on the question where the major fault lies for the allision. The evidence and explanations of the Captain of the Hellenic Navigator are not worthy of belief and are inconsistent with the objectively ascertainable facts and circumstances. Moreover, his peculiar conduct in continuing away from the scene without ascertaining whether the object he struck was manned, his mislocation, by a wide margin, of the allision, his failure to ascertain exactly what he struck or even its color (international orange), his attempt to conceal the path of his ship by erasing the markings on the ship's navigation chart, and his explanations generally, all stamp him as a witness whose credibility is unacceptable.

5. This statute, in effect at the time of this allision, was repealed subsequently on August 26, 1983, Pub.L. No. 89, § 4(b), 97 Stat. 599, and as amended, recodified at 46 U.S.C. §§ 2303, 2304 (Supp. I 1983).

### A. Hellenic Navigator's Negligence

■ "Collision liability is based on fault; the mere fact of impact has no legal consequence." G. Gilmore & C. Black, *The Law of Admiralty* § 7-2, at 486 (2d ed. 1975). Thus, negligence must be demonstrated before liability is imposed for collisions (or allisions).

#### 1. Standard of Care

The concept of "fault," however, presupposes a standard of care. In collision cases, that standard of care is provided by specific statutory provisions and by the vaguer concepts of custom, reasonable care and good seamanship. Gilmore & Black identify four sources for the standard of care in collision cases:

1. The statutory Rules of Navigation. The United States has four sets of these in force, much resembling one another but applying to different waters.

2. Other statutes, and regulations having the force of statutes. These include both Federal and state or local enactments, subject to the obvious requirement that the latter not contradict Federal law.

3. Proved local "customs" not contradicting either of the above.

4. The requirements (in the interstices of the Rules and other statutory material, and in cases they do not cover) of good seamanship and due care.

G. Gilmore & C. Black, *supra*, § 7-3, at 488-89 (footnotes omitted).

#### a. The Statutory Standard

The International Regulations For Preventing Collisions At Sea, 1972, adopted as part of United States law in 1977, set out following 33 U.S.C. § 1602 (1982), apply to high seas navigation, G. Gilmore & C. Black, *supra*, § 7-3, at 489, and thus are applicable to this allision on the high seas in the Persian Gulf. Gilmore & Black note that:

These Rules of the Road ... are of extreme importance in the allocation of collision liability. More often than not, the finding of "fault" on the part of the ship in collision rests on her having violated one of the Rules.... [T]hese Rules ... are strictly and literally construed, and compliance is insisted upon. This is how it should be, for, though they have the force of statute, they are not couched in legal terms of art, and are not lawyers' law, but are plain and simple directions addressed to ship's officers, the more competent among whom have most of them substantially committed to memory.

G. Gilmore & C. Black, *supra* § 7–3, at 489.

### 1. *The Pennsylvania Rule*

The strictness of the application of these statutory standards is magnified by the Supreme Court's decision that violation of a statutory standard of care, establishing that vessel's fault, also shifts the burden on the proximate cause issue to the one violating the statutory rule to prove that the violation "could not have been" one of the causes of the accident:

The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

*The Steamship Pennsylvania v. Troop*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874). The harshness of this rule, which results in most cases in a finding of liability, has been ameliorated to a great extent by the relatively recent Supreme Court decision that abolished the old rule of dividing damages equally among the parties at fault, regardless of their relative degrees of culpability. Courts, in collision cases, now apply a comparative negligence standard in assessing damages based on each party's relative degree of fault. *See* discussion below.

Despite this 1975 change to a comparative fault method for determining damages, the Second Circuit has made it clear that the *Pennsylvania* burden-shifting rule remains in full force. *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1160 (2d Cir.1978) ("The 'Pennsylvania rule' is still alive and well today."), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979); *see also Moran Towing & Transportation Co. v. City of New York*, 620 F.2d 356, 358 (2d Cir.1980) (finding that the vessel had not met its "burden of showing that its statutory fault *could not have caused* the accident.") (emphasis added).

### 2. *The Applicable International Regulations*

Aramco has identified four specific international rules, reproduced below in their entirety, that it claims Hellenic violated:[6]

*Rule 2. Responsibility*

(a) Nothing in these Rules shall exonerate any vessel, or the owner, master or crew thereof, from the consequences of any neglect to comply with these Rules or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

(b) In construing and complying with these Rules due regard shall be had to all dangers of navigation and collision and to any special circumstances, including

---

**6.** Hellenic does not, nor could it, claim that Aramco violated any specific rule of the International Regulations since those rules only apply to "vessels," which are defined as "every description of watercraft ... used or capable of being used as a means of transportation on water." 33 U.S.C. § 1601 (1982). An oil platform clearly is not a means of transportation and therefore is outside the coverage of these rules. Hellenic thus relies on general negligence principles to hold Aramco liable.

the limitations of the vessels involved, which may make a departure from these Rules necessary to avoid immediate danger.

*Rule 5. Look-out*

Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

*Rule 6. Safe Speed*

Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.

In determining a safe speed the following factors shall be among those taken into account:

(a) By all vessels:

(i) The state of visibility;

(ii) The traffic density including concentrations of fishing vessels or any other vessels;

(iii) The maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;

(iv) At night the presence of background light such as from shore lights or from back scatter of her own lights;

(v) The state of wind, sea and current, and the proximity of navigational hazards;

(vi) The draught in relation to the available depth of water.

(b) Additionally, by vessels with operational radar:

(i) The characteristics, efficiency and limitations of the radar equipment;

(ii) Any constraints imposed by the radar range scale in use;

(iii) The effect on radar detection of the sea state, weather and other sources of interference;

(iv) The possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range;

(v) The number, location and movement of vessels detected by radar;

(vi) The more exact assessment of the visibility that may be possible when radar is used to determine the range of vessels or other objects in the vicinity.

*Rule 7. Risk of collision*

(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

(b) Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.

(c) Assumptions shall not be made on the basis of scanty information, especially scanty radar information.

(d) In determining if risk of collision exists the following considerations shall be among those taken into account:

(i) Such risk shall be deemed to exist if the compass bearing of an approaching vessel does not appreciably change;

(ii) Such risk may sometimes exist even when an appreciable bearing change is evident, particularly when approaching a very large vessel or a tow or when approaching a vessel at close range.

### a. Proper Lookout

■ "It is axiomatic that an 'inefficient lookout is equivalent to none.'" *Interstate Towing Co. v. Stissi,* 717 F.2d 752, 755 (2d Cir.1983) (quotation source omitted), *opinion after remand,* 765 F.2d 370 (2d Cir. 1985). Thus, it follows that Rule 5 (proper lookout) is violated if it is inefficient, *i.e.,* negligent, under the circumstances of the case, to have a lookout on the bridge but not on the bow.

■ In the conditions under which Captain Nikas was sailing, he should have placed a lookout on the bow from which the stationary platform would be sighted visually at a distance and in sufficient time

for Hellenic Navigator to have turned clear and avoid the allision. The presence of a lookout only on the bridge was, in these circumstances, negligent operation of the vessel.

Captain Nikas was navigating between two oil fields, at a full sea speed, despite knowing that there are numerous unlit and uncharted oil rigs and platforms in the Persian Gulf. Although the allision occurred two miles outside one of the oil fields, Captain Nikas intended to get much closer to that oil field; common sense dictates that the closer one gets to the oil field, the more likely the risk of encountering one of these unlit, uncharted oil rigs or platforms. Yet Captain Nikas proceeded in the face of this danger without the additional precaution of placing a lookout on the bow even though the Hellenic Navigator's bridge view was partially obstructed by cranes, kingposts, and booms in the front part of the ship.[7] Compounding this negligence, Captain Nikas sent the watch officer below to do paperwork rather than have his added vigilance on the bridge in these hazardous circumstances.

In sharp contrast to this imprudence, the Captain of the British tanker, in responding to the Hellenic Navigator's distress signal, immediately placed a lookout on the bow to search for possibly unlit and uncharted oil rigs and platforms near the oil fields.

The Hellenic Navigator failed to refute the convincing evidence of this statutory fault by any satisfactory evidence that the absence of a lookout stationed forward could not have caused or avoided the allision with this brightly-colored platform. *See Erie Lackawanna Railway Co. v. Timpany*, 495 F.2d 830, 834 (2d Cir.1974) ("This statutory violation issue [of failing to post a lookout] was not raised below, but we see no point in remanding on the question because the record before us makes it evident that there is no possibility that the vessel might establish the absence of a lookout *could not have* caused the collision.") (emphasis in original).

Of course, the need for a lookout on the bow varies depending upon the circumstances under which the vessel is operating. Indeed, two district court cases from this circuit have held that not having a lookout on the bow, in the circumstances of their cases, is not negligent. *Connecticut v. Tug Cynthia Moran*, 607 F.Supp. 24, 29 (D.Conn.1984) (Mansfield, J.) ("Nor was he negligent in not posting a lookout at the barge's bow since doing so would not improve line-of-sight visibility to the Railroad Bridge over that from the pilot house."); *Granholm v. TFL Express*, 576 F.Supp. 435, 448–49 (S.D.N.Y.1983) ("A lookout stationed on the bridge wing may be more closely supervised [than one on the bow].... I conclude in this case that a container ship with her bridge located aft and the bow obscured by containers, proceeding in uncongested waters on a clear night, does not violate Rule 5 by posting a lookout on the bridge wings rather than on the bow.").

In the widely-known hazardous circumstances under which the Hellenic Navigator was navigating, however, failure to post a lookout on the bow was imprudent and negligent.

b. *Use of Radar*

 "If a vessel carries properly functioning radar equipment and she is in or approaching an area of known poor visibility, there is an affirmative duty to use the radar." *Afran Transport Co. v. The Bergechief*, 274 F.2d 469, 474 (2d Cir.1960) "A vessel equipped with radar is under a duty to use it intelligently and fully, and the master or pilot who fails to do so is heavily burdened to prove that such fault did not contribute to the collision." *Williamson Leasing Co. American Commercial Lines, Inc.*, 616 F.Supp. 1330, 1340 (E.D.La.1985). "[T]he obligation to use radar naturally comprises the obligation to use it prudently." G. Gilmore & C. Black, *supra*, § 7–12, at 513 (footnote omitted).

---

**7.** The Hellenic Navigator's helmsman testified that the steering console is a very poor lookout position because of masts, kingposts, and booms in the forward portion of the vessel.

■ The Court is convinced that the radar of Hellenic Navigator was not properly manned or utilized by the vessel's personnel. It was not credibly established as a fact that there was such poor visibility or anything else reasonably established in the evidence as affecting a radar view ahead in time for evasive action. The Court does not accept as credible that the Captain manned the radar as claimed in his deposition testimony; the circumstantial evidence compels a conclusion of fact that the orange (or yellow) platform could and should have been seen visually as well as on radar in time for the vessel to take proper and successful evasive action. As mentioned in one of the exhibits by a qualified expert, a ship's radar properly managed and in proper working order could not have failed to pick up a steel structure the size of this platform at least six miles ahead in the circumstances shown in the evidence.

The Hellenic Navigator, by radar, had detected a lighthouse at 12.2 miles distance about three hours before the allision and had detected a buoy, a target smaller than the platform, at 1.9 miles distance about 40 minutes before the allision. Moreover, the Hellenic Navigator's second officer, who was sent below deck by the Captain to do paperwork before the allision, testified that upon returning to the bridge after the allision, he detected the platform's target on the ship's radar about seven or eight minutes after the allision at about two miles away. The radar therefore was functioning properly, but the necessary inference from all the facts and circumstances in evidence is that it was negligently operated by the Captain. Indeed, it is clear that the Hellenic Navigator's Captain, the person supposedly monitoring the radar, did not even know, or could not tell by navigational instruments, where his own ship was at the time of the allision; he reported to the vessels answering the Hellenic Navigator's distress call that the allision had taken place six miles from where it actually took place. Such a glaring inaccuracy casts considerable doubt upon the Captain's proper operation of navigation aids, including radar.

The theoretical opinions of experts must of course be evaluated in connection with the factual evidence and circumstances, and although of interest and aid to the Court's understanding, nonetheless must give way to the resolution of facts on the basis of the Court's judgment on the evidence presented. Hellenic Navigator's expert testimony on ducting theory, although informative and interesting and no doubt valid in the abstract, is rejected as inapplicable to, or certainly not proven on, the facts of this case.

### B. *Aramco's Negligence*

It is equally clear, however, that plaintiff's fault was also a contributing factor, to a degree, in the cause of the allision. The platform was not equipped with a device to produce an audible sound signal to approaching vessels; it lacked functioning night lighting; notification of its presence was not given to navigational authorities.

The platform was located in a recognized sea lane for international merchant traffic. It had operational lighting when installed but, through want of ordinary care, those lights failed because of lack of battery power, possibly because sun switches were not installed on the lights to conserve battery power during daylight hours. Aramco had instructed that sun switches be installed but the contractor omitted them. Significantly, however, Aramco knew of this omission at the time of installation of the platform, January 16, 1981, over a month before the allision. Aramco did nothing to correct the lack of sun switches during that time period, even though the battery, without sun switches, could not have lasted until the date of the allision, February 20, 1981. It is no defense to a negligence claim for Aramco to argue that it did not know that the batteries could not last that long without sun switches because it *should* have known.

Lighting provides a vital function in helping to prevent the very type of accident that occurred in this case. At night, lights assist a ship's lookout in sighting possible

obstructions at a much further distance than is otherwise possible. Since it requires a fair distance for ships to change course to avoid an obstruction, early notification by the lookout to the watch officer of the presence of an obstruction is a most useful method of avoiding these allisions. Based on the evidence presented, the Court finds that had this platform been lighted properly, the Hellenic Navigator, despite its negligent lookout, would have sighted it in time to warn the otherwise negligent operation of the ship of danger ahead.

### C. *The Comparative Fault Standard For Allocating Damages*

■ Damages are no longer divided equally without regard to the parties' respective comparative fault. Under the old rule, *see The Schooner Catharine v. Dickinson*, 58 U.S. (17 How.) 170, 15 L.Ed. 233 (1855), which prevailed for over a century, lower courts grudgingly followed the Supreme Court's holding that when two parties are at fault, regardless of the disparate degrees of fault involved, the damages in a collision action are to be divided equally. About ten years ago, however, the Supreme Court, noting widespread criticism, abandoned that rule in favor of a rule of comparative negligence:

> We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.

*United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1715–1716, 44 L.Ed.2d 251 (1975).

The fact is that the brightly-painted orange or yellow steel platform was not a hidden trap, but an obstruction that could and should have been seen by the vessel's navigator. In short, the Hellenic Navigator was in a superior position to have avoided and prevented the allision. On the other hand, proper lighting, sound warning, or other navigational warning, if not omitted by Aramco's negligence, would have aided greatly in preventing this allision.

Since the Hellenic Navigator entered the area without up-to-date navigational maps, knew that unlighted platforms existed and were common in the area being traversed and chose to proceed at full sea speed in reliance solely upon the accuracy and attentiveness of its own observation of navigational hazards, it proceeded in disregard of whether there were conventional warnings and with substantially less than total reason to complain of plaintiff's omissions in failing to provide warnings of the platform's presence.

On the comparative fault inquiry, this Court recognizes that it has considerable discretion in determining the relative degrees of each party's fault in contributing to the allision. *See Getty Oil Co. v. SS Ponce De Leon*, 555 F.2d 328, 335 (2d Cir. 1977) (applying the clearly erroneous standard in reviewing the district court's comparative fault determinations); *see also Interstate Towing Co.*, 717 F.2d at 753 (same). Considering all the facts and circumstances of this case, in the interests of justice, the Court will ascribe 66⅔% of the fault to defendants, and 33⅓% of the fault to plaintiff Aramco; damages, when ascertained, shall be apportioned accordingly.

The foregoing and the findings to be submitted as adopted by the Court will constitute the findings and conclusions required by Rule 52(a), Fed.R.Civ.P.

Submit findings of fact and conclusions of law and judgment accordingly, on five days notice.

So Ordered.

### SUPPLEMENTAL FINDINGS

The parties having each requested additional Findings of Fact, it is hereby found that:

No evidence was presented that the Radio Officer of the Hellenic Navigator was tuned to receive, and no evidence was

presented that any of the MENAS broadcast warnings were reported by, the Hellenic Navigator's officer to the master or navigation officers during the period that the vessel was traversing the Persian Sea in the area involved herein.

After the Hellenic Navigator struck and passed the platform and was at a distance of approximately two-and-a-half miles from it, it presented a clear target on the ship's radar.

The master's credibility is further brought into question by his effort to induce the watch officer to falsify his absence from the bridge at the time of collision, and by the master's denial, not worthy of belief, that he did not look at the radar after the collision, but did look before the collision.

The foregoing shall constitute supplemental findings in pursuance of R. 52(b), Fed.R.Civ.P.

So Ordered.